WASTE MANAGEMENT OF WISCONSIN, INC., Plaintiff-
Appellant-Petitioner,

v.

KENOSHA COUNTY BOARD OF REVIEW and Richard E.
Ellison, Defendants-Respondents.

Supreme Court

*No. 92–2951. Oral argument March 30, 1994.—Decided June
9, 1994.*

(Also reported in 516 N.W.2d 695.)

For the plaintiff-appellant-petitioner there were briefs by *Jean G. Setterholm* and *DeWitt Porter,* Madison and oral argument by *Jean G. Setterholm.*

For defendant-respondent, Richard E. Ellison, there was a brief by *Bernard R. Vash,* first assistant corporation counsel and *Kenosha County Corporation Counsel,* Kenosha and oral argument by *Bernard R. Vash.*

For defendant-respondent, Kenosha County Board of Review, there was a brief by *Donald E. Mayew* and *Plillips, Richards, Mayew & Corrigall, S.C.,* Kenosha and oral argument by *Donald E. Mayew.*

Amicus curiae brief was filed by *David E. Stewart* and *Stewart Law Offices, S.C.,* Milwaukee for the Wisconsin Chapter of the National Solid Wastes Management Association.

SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals, *Waste Management of Wisconsin, Inc. v. Kenosha County Board of Review and Richard Ellison,* 177 Wis. 2d 257, 501 N.W.2d 883 (Ct. App. 1993), affirming a judgment of the circuit court for Kenosha county, Michael S. Fisher, circuit judge. The circuit court affirmed an ad valorem tax assessment by the Kenosha county board of review of three parcels of land owned by Waste Management of Wisconsin, Inc.

The issue presented is whether the Kenosha county board of review acted in accordance with Wisconsin law in determining the assessed value of the real estate, specifically the sanitary landfill site. Waste Management contends that the board improperly based its assessment on owner-operator income, that is, the net income generated by Waste Management's operation of a sanitary landfill on two of the three parcels. The court of appeals, reasoning that the net income generated by Waste Management as owner-operator could be attributed to the underlying real estate, upheld the board's reliance on this appraisal methodology. We affirm the decision of the court of appeals.

According to the record, both the Kenosha County Assessor and Waste Management presented the board of review with testimony by expert witnesses who variously appraised the property using the cost, market, and net income approaches to property valuation. These witnesses disagreed about which approach most accurately reflected the value of the sanitary landfill site; they failed to reach a consensus on the value of the real estate under any one methodology. Ultimately, after considering all of these approaches, the board of review reached its own conclusion, determining the property's value despite the conflicting evidence before it. Because we conclude that a reasonable view of the evidence supports the board of review's decision, we uphold the board's determination and affirm the decision of the court of appeals.

## I.

The parcels of land in question are located in the Town of Paris, Kenosha county, and were purchased by Waste Management in 1980 for the sum of $1.9 million. The three parcels are situated adjacent to one another and together total approximately 388 acres in size. On two of the parcels, accounting for roughly 242 of the 388 total acres, Waste Management now operates an 80-acre sanitary landfill known as Pheasant Run. Waste Management presently holds a license from the Wisconsin Department of Natural Resources to operate the Pheasant Run site. The third parcel, covering the remaining 146 acres, contains a small gatehouse, a scale for weighing incoming waste, an asphalt driveway providing access to the Pheasant Run site, and a 54-acre landfill now closed to dumping.

In 1990, the Kenosha County Assessor valued the three parcels at close to $27 million for purposes of ad

valorem taxation. Prior to 1990, the assessed value of the entire property had been approximately $3.75 million.

The Assessor attributed approximately $26 million of the property's total value to the two parcels on which Waste Management operates the Pheasant Run landfill. That figure resulted from a combination of two valuation approaches. First, with respect to the 80-acre sanitary landfill site, the Assessor provided a written appraisal utilizing an "income approach," in which land value is based on the present worth of the expected stream of net owner-operator income from the landfill over the remainder of its life.[1] The Assessor rejected the cost approach (based on estimates) as inapplicable to this landfill site and rejected the market approach (adjusting the sale prices of reasonably comparable property) as too inconclusive to establish a value for the real estate. Instead, relying on an article by Robert L. Foreman in the 1978 edition of the *Encyclopedia of Real Estate Appraising,* the Assessor concluded that owner-operator income alone dictated the price of landfill property. The Assessor's calculations yielded an assessed value of approximately $25 million for the 80-acre landfill site.

---

[1] To summarize, the Assessor first estimated the gross annual income of the landfill based on posted tipping fees and the site's annual capacity to accept waste. (The Assessor was forced to rely on estimated figures because Waste Management did not furnish actual income data.) He then estimated Waste Management's annual expenses, including management expenses, in operating the site, deducting these expenses from the gross annual income to reach the site's net annual income. The Assessor capitalized the landfill's net annual income, multiplying it by a discount rate to derive a present value for the income stream over the remaining life of the landfill.

Second, with respect to the vacant 162 acres surrounding the landfill site, the Assessor utilized the cost approach. He determined the value per acre by examining statewide sales of comparable lands. His analysis yielded a figure of roughly $970,000 for these 162 acres. Adding this sum to the $25 million value of the 80-acre landfill site, the Assessor reached a total value of approximately $26 million for the 242 acres covered by these two parcels.

Next, using the data drawn from the cost analysis of the vacant portion of the first two parcels, the Assessor estimated a per acre purchase cost for the usable acres of the third parcel owned by Waste Management. The 54-acre closed landfill site was exempted from the assessment and assigned no value. Including the depreciated value of existing improvements to the land, the Assessor valued the entire 146-acre parcel at roughly $850,000. Together, the value of the three parcels of land was thus assessed at almost $27 million.

Waste Management challenged the Assessor's calculations before the Kenosha county board of review. Waste Management argued that the income approach could not be used and, alternatively, that the particular method relied upon by the Assessor included the value of not only the real estate but the landfill license as well.

At hearings before the board in June 1990, Waste Management's independent appraisal expert, Michael J. Kelly, testified that the value of the entire property was roughly $2.3 million. He based this conclusion on his use of the cost approach. Kelly rejected the owner-operator income approach utilized by the Assessor with respect to the two parcels containing the landfill, arguing that the Assessor improperly included in his final assessment not only the value of the real estate, but

also the value of the ongoing business concern. According to Kelly, Waste Management's business ability and resources had allowed it to obtain the landfill license, and a significant portion of the value of the operation was attributable to the business rather than to the real estate. Kelly rejected the market approach, reasoning that it would value both the tangible real estate and the intangible business enterprise.

The general manager of Pheasant Run testified that 50–60% of the revenue generated by the site was attributable to business from hauling companies owned by Waste Management's parent company. Without this business, he concluded, the landfill would fill up half as fast and the income would be reduced accordingly.

After considering the evidence presented by both Waste Management and the Assessor, the board of review affirmed the Assessor's valuation of the three parcels.

Waste Management appealed from the determination of the board of review by an action for certiorari under sec. 70.47(13), Stats. 1991–92, and in July 1991, the circuit court for Kenosha county, Michael S. Fisher, circuit judge, set aside the board of review's decision. The circuit court concluded that the Assessor had acted contrary to Wisconsin law, reasoning that the Assessor had proceeded "on the false assumption that the landfill license is real estate" and that "income was the [Assessor's] only concern and was the sole basis upon which the assessment was based." The circuit court ordered the matter remanded to the board of review for reconsideration and redetermination, stating that "it may well be that the assessor upon consideration of factors could justify the assessment."

Complying with the circuit court's remand, the board of review reconvened in November 1991 to consider additional information presented by both sides. All the witnesses agreed that the highest and best use of this property is as a landfill.

Newly revealed information made it clear that the Assessor's original estimates of Waste Management's income were substantially lower (roughly 35%) than the actual income generated by Waste Management in its operation of the landfill. The Assessor nevertheless continued to rely on the more conservative income estimates in projecting a value for the property.

At the hearing, the Assessor updated his prior written appraisal and submitted additional analyses of the property's value, utilizing both a market approach (by which he valued the land at $25 million) and the cost approach (by which he valued the land at $23.4 million).[2] Reconciling the estimates yielded by these various approaches with that originally reached under the income analysis, the Assessor concluded that the two parcels containing Pheasant Run were worth $25 million (approximately $1 million less than his original estimate).

The Assessor testified that the license to operate a landfill site has no intrinsic value because the license cannot be sold or transferred and cannot be separated from the land except by forfeiture. Therefore, according to the Assessor, the license to operate Pheasant Run

[2] Under the cost approach, the Assessor apparently used a land residual technique to value the land. Waste Management contends that this technique, although a means of determining cost, is in fact based on income. According to Waste Management, the land residual technique has the same inherent defect as the net income approach; it too includes intangible business value.

was "intricately intertwined" with the land and was not to be considered separately in the income analysis.[3] The board of review's brief asserts that the Assessor placed no independent or separate value on the license.

Dr. George Karvel, a real estate professor who also works as a private land valuation consultant, testified on behalf of the Assessor in support of the Assessor's cost approach using the land residual technique. Karvel further testified that to the extent that Waste Management is providing its own management services, it deserves to earn a profit for such services. He concluded that the business value component associated with management, at least in regional shopping malls, is a very small percentage of the total value of the real estate asset. He further concluded that the Assessor's failure to consider Waste Management's actual higher net income and the probable gas production "more than account for any business value that may be associated with the property."

At the 1991 board of review hearings Waste Management presented testimony by a number of experts about the value of the landfill property. Each of these expert witnesses reached a different estimate of value.

R.L. Nichols, a registered industrial valuation engineer, utilized a cost approach to value the three parcels together at $3.3 million. Although Nichols also used market and income approaches to value the property, he preferred the cost approach; in his opinion, both the market and income approaches represented transfer of some elements of business value in the form of permits or intangible values. His market approach

---

[3] Dr. Karvel testified that he understood that a landfill license runs with the land and is transferable to another operator but he could not answer the question of whether it is possible to value the license separately.

yielded a value of about $4.1 million for all three parcels. His income approach, based on rental income of landfills, yielded a total value of $6.4 million. Nichols asserted that the Assessor's valuation was flawed because it did not exclude the value of intangibles owned by Waste Management, such as the landfill license.

Also testifying on behalf of Waste Management was Robert L. Foreman, the author of an article on the valuation of sanitary landfills in the *Encyclopedia of Real Estate Appraising*. Foreman concluded that the cost and market approaches were not the best indicators of value for landfill sites such as Pheasant Run. Instead, he asserted, landfills should be valued through an income approach based on an estimate of what an owner could earn by leasing the landfill to an operator.[4] Foreman stated that the use of such rental income distinguishes the value of the business from the value of the underlying real estate. Using this approach, Foreman ultimately concluded that the combined value of the two parcels containing the Pheasant Run landfill ranged from $4.8 to $6.4 million.

Foreman characterized the Assessor's reliance on owner-operator income as flawed because the Assessor had attributed to the real estate the entire net income or profit from the landfill operation. In doing so, Foreman suggested, the Assessor improperly failed to allow for a return on Waste Management's ability to obtain and retain the landfill license, among other assets contributing to the production of income at Pheasant Run, including the landfill machinery and equipment, the

---

[4] In contrast, the Assessor relied on estimates of what Waste Management actually earned itself as owner-operator of the site.

license itself, and working capital.[5] Foreman concluded that the difference between the value yielded under an income approach based on owner-operator income and the value reached under his income method based on rental income represented this "business value."[6]

At the close of the 1991 hearing, the board of review again affirmed the Assessor's estimate of value for the three parcels. On appeal by Waste Management, the circuit court for Kenosha county affirmed the decision of the board of review, holding that "the method of assessment used and presented to the Board was in accordance with the law and included appropriate subject matter." The court of appeals affirmed the circuit court's judgment, concluding that the landfill license and business value adhere to the land and are taxable therewith.

---

[5] In his encyclopedia article, however, Foreman did not advocate such a "split off" of business enterprise value. Instead, his article accounted for overall business management by a deduction of 10–12% from the gross income stream. The Deputy Assessor seemingly used this method in this case.

[6] Using a discount rate higher than that relied upon by the Assessor, Foreman suggested that the estimated value of the Pheasant Run property under the income method based on owner-operator income was $18.8 million. Using a higher discount rate yields a lower estimate of value. According to Foreman, the difference between this $18.8 value and the $6.4 million estimate reached under his income method based on rental income amounted to a business value of approximately $12 million.

## II.

The same questions are presented to this court as were presented to the circuit court and the court of appeals. We review the board of review's assessment of Waste Management's property in the same manner as both the circuit court and the court of appeals, benefitting from their analyses and opinions. *Steenburg v. Town of Oakfield,* 167 Wis. 2d 566, 571, 482 N.W.2d 326 (1992).

On certiorari review under section 70.47(13), Stats. 1991–92,[7] a court reviews the record of the board, applies the certiorari standard of review and considers the following factors: (1) whether the board acted within its jurisdiction; (2) whether the board acted according to law; (3) whether the board's action was arbitrary, oppressive or unreasonable, representing its will rather than its judgment; and (4) whether the evidence was such that the board might reasonably make the order or determination in question. *See Darcel, Inc. v. Manitowoc Bd. of Review,* 137 Wis. 2d 623, 626, 405 N.W.2d 344 (1987); *State ex rel. Brookside Poultry Farms, Inc. v. Jefferson County Bd. of Adjustment,* 131 Wis. 2d 101, 122, 388 N.W.2d 593 (1986); *State ex rel. Mitchell Aero. v. Bd. of Review,* 74 Wis. 2d 268, 281–82, 246 N.W.2d 521 (1976).

A court must correct errors of law; if the board failed to follow the statutory basis for tax assessment,

---

[7] Section 70.47(13), Stats. 1991–92, provides in relevant part:

> Except as provided in s. 70.85, appeal from the determination of the board of review shall be by an action for certiorari commenced within 90 days after final adjournment of the board.

the board's determination is subject to reversal. *State ex rel. Garton Toy Co. v. Town of Mosel,* 32 Wis. 2d 253, 257–58, 145 N.W.2d 129 (1966). If the assessment is made in accordance with the statutory mandate, however, it must be upheld if it can be supported by any reasonable view of the evidence. *State ex rel. Giepel v. Milwaukee,* 68 Wis. 2d 726, 732, 229 N.W.2d 585 (1975); *State ex rel. N/S Associates v. Greendale Bd. of Review,* 164 Wis. 2d 31, 42, 473 N.W.2d 554 (Ct. App. 1991). "The presumptions are all in favor of the rightful action of the board." *Darcel, Inc. v. Manitowoc Bd. of Review,* 137 Wis. 2d 623, 626, 405 N.W.2d 344 (1987) (quoting *State ex rel. Boostrom v. Bd. of Rev.,* 42 Wis. 2d 149, 155, 166 N.W.2d 184 (1969)).

### III.

The words "real property," "real estate" and "land" as used in ch. 70 entitled "General Property Taxes," include "not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto. . . ." Section 70.03, Stats. 1989–90. Valuation of real estate is governed by sec. 70.32, Stats. 1989–90, which requires valuation of real estate at its sale or market value. Section 70.32(1), Stats. 1989–90, provides, in relevant part:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under section 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale.[8]

---

[8] Effective January 1, 1992, the following sentence was added to sec. 70.32(1): "In determining the value, the assessor

As Waste Management points out, the basic mandate of the above quoted portion of the statute differs little from that set forth in the Statutes of 1878.[9] In reviewing an assessment under the mandate of section 70.32(1), Stats. 1989–90, we are guided by a number of well developed principles.

A property's full value is defined as its fair market value, or the amount the property will sell for in an arm's-length transaction on the open market between a willing seller not obliged to sell the property and a willing buyer not obliged to purchase it. *State ex rel. Mitchell Aero. v. Bd. of Review,* 74 Wis. 2d 268, 277, 246 N.W.2d 521 (1976); *Rosen v. City of Milwaukee,* 72 Wis. 2d 653, 661, 242 N.W.2d 681 (1976); *State ex rel. Markarian v. Cudahy,* 45 Wis. 2d 683, 685, 173 N.W.2d 627 (1970); *State ex rel. Garton Toy Co. v. Town of Mosel,* 32 Wis. 2d 253, 259, 145 N.W.2d 129 (1966). A recent arm's-length sale of the subject property, or sales of reasonably comparable land, represent the best information with which to determine fair market value. Given evidence of such sales, it is error for an assessor to look to other information to value the prop-

shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's length sales of reasonably comparable property; recent arm's length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed." *See* sec. 70.32(1), Stats. 1991–92.

[9] Section 1052, Stats. 1878, provided: "Real property shall be valued by the assessor from the actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale."

erty. *Darcel, Inc. v. Manitowoc Bd. of Review,* 137 Wis. 2d 623, 629, 405 N.W.2d 344 (1987); *Rosen v. City of Milwaukee,* 72 Wis. 2d 653, 663–64, 242 N.W.2d 681 (1976); *State ex rel. Giepel v. Milwaukee,* 68 Wis. 2d 726, 737, 229 N.W.2d 585 (1975).[10]

In the absence of such sales, however, an assessor must determine market value from the best information the assessor can practicably obtain, considering all elements which collectively have a bearing on the value of the property. *State ex rel. Park Plaza S.C. v. Board of Review,* 61 Wis. 2d 469, 473, 213 N.W.2d 27 (1973) (quoting with approval *Superior Nursing Homes, Inc. v. Wausau,* 37 Wis. 2d 570, 574–76. 155 N.W.2d 670 (1968)). Such elements, as identified by various decisions of this court, include, among others, cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals procured by the owner. *Rosen v. City of Milwaukee,* 72 Wis. 2d 653, 663, 242 N.W.2d 681 (1976); *State ex rel. Park Plaza S.C. v. Bd. of Review,* 61 Wis. 2d 469, 474, 213 N.W.2d 27 (1973); *Superior Nursing Homes v. Wausau,* 37 Wis. 2d 570, 575, 155 N.W.2d 670 (1968); *State ex rel. Garton Toy Co. v. Town of Mosel,* 32 Wis. 2d 253, 259, 145 N.W.2d 129 (1966); *State ex rel. I.B.M. Corp. v. Bd. of Review,* 231 Wis. 303, 311–12, 285 N.W. 784 (1939). The methodology suggested in chapter seven entitled "Real Property Valuation" of the *Property Assessment Manual for Wisconsin Assessors* (to which sec. 70.32(1), 1989–90, refers), essentially mirrors this analytical

[10] Whether all the teachings of these cases survive the 1992 revision of sec. 70.32(1) is not before us.

framework. *See* 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 7, at 7–3.

Given these principles under the mandate of section 70.32(1), Stats. 1989–90, the following rules have been developed with respect to the specific use of income generated from real estate as a basis for valuing that property: (1) Evidence of net income may be utilized in order to show the fair market value of a parcel of land, but only in the absence of a recent arm's-length sale of the property or sales of reasonably comparable property. *Bischoff v. Appleton,* 81 Wis. 2d 612, 618–19, 260 N.W.2d 773 (1978); *Rosen v. City of Milwaukee,* 72 Wis. 2d 653, 670, 242 N.W.2d 681 (1976). (2) Income may never be the sole basis for an assessment of property. *Bischoff v. City of Appleton,* 81 Wis. 2d 612, 619, 260 N.W.2d 773 (1978) (quoting *State ex rel. I.B.M. Corp. v. Bd. of Review,* 231 Wis. 303, 312, 285 N.W. 784 (1939)).[11] *See also* Annot., *Income or Rental Value as a Factor in Evaluation of Real Property for Purposes of Taxation,* 96 A.L.R.2d 666 (1964).

Using these rules as our guide, we conclude that the board and the Assessor did not act in contravention of Wisconsin assessment law by relying on the income approach, along with other methodologies, to value the two parcels of land containing the Pheasant Run landfill. Since Waste Management had owned the site since 1980, there had been no recent sale of the land at the

---

[11] "Though net income from the rental of either real or personal property is always a proper element to consider, it cannot be considered as the sole controlling factor in determining value of either real or personal property . . . .. Such a rule, if given approval, would require a holding that nonincome-producing property is practically valueless for taxation purposes." *I.B.M. Corp.,* 231 Wis. at 312.

time of the 1990 assessment. Nor does the record suggest that reliable data could be derived from sales of reasonably comparable property. Although the Assessor analyzed sales of four other Wisconsin landfills in his 1991 updated appraisal, he concluded that the land involved in those sales was not sufficiently comparable to the Pheasant Run site to provide a reliable basis for valuing the site. One of Waste Management's experts also presented an appraisal based on data from the same four sales. Despite the fact that both Waste Management's expert and the Assessor utilized the same information, their value estimates based on "comparable" sales diverged by some $21 million. Moreover, another Waste Management expert concluded that the market approach was not useful in this case. Given this record, in this case the board had reason to doubt the reliability of the market approach and could reasonably conclude that it and the Assessor could look to other elements, including the cost approach and the income generated by the site, in valuing the property.

Waste Management suggests that the Assessor and the board based their analyses on income alone. We do not agree with Waste Management's characterization of the record. While the Assessor's original attempt to value the two parcels was apparently based on an income approach alone, his testimony before the board of review at its 1991 hearings undermines Waste Management's assertion. The Assessor's updated appraisal included analyses under both the market and the cost approaches. Under each of these approaches, the Assessor considered any number of factors in reaching his conclusions, including, but not limited to, the cost to purchase like property, the depreciated value of existing improvements, the property's

replacement value, income generated by the property, and sales of comparable property (to the extent possible). Ultimately, the Assessor reconciled the results derived under each separate methodology to reach a final estimate of the value of the landfill property. Thus, to conclude that the Assessor relied solely on Waste Management's net income in valuing the property would be to ignore a substantial portion of the evidence presented before the board of review. We decline to do so.

We conclude that, in the absence of a recent sale of the property at issue or recent sales of comparable property, the board was presented with a variety of approaches to valuation, both by the Assessor and Waste Management. The Assessor's and board's consideration of the net income approach in this case therefore does not constitute an error of law. We conclude, as did the circuit court and court of appeals, that the Assessor and board of review did not err in using an estimate of Waste Management's net income as owner-operator of the Pheasant Run landfill as one basis for valuing the two parcels of land containing the landfill site.

Waste Management presents another objection to the Assessor's use of the income approach, however. According to Waste Management, Wisconsin law does not permit the use of "owner-operator" income to value real estate under the income approach because the resulting tax assessment includes not only the value of the real estate but also the business value of the owner's use of the property.

Waste Management suggests that any assessment under the income approach must be based not on the owner's actual income but on the income the owner could generate by leasing the property to another oper-

ator. Only the use of such "rental" income, Waste Management argues, is allowable under the income approach and only rental income will exclude business value generated by the owner from an assessment of the underlying real estate.

To address Waste Management's argument we begin by discussing the basic principles underlying the net income approach. This method is not a means of taxing business income. Rather, an assessor uses this methodology to convert the future benefits likely to be derived from real estate into an estimate of present market value. 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 7, at 7–20. As the *Manual* recognizes, "The income approach can be useful in that it represents the way investors think when they buy and sell income property in the market." *Id.* Indeed, the *Manual* cites the income approach as an appropriate method of valuing a number of different properties, including commercial structures, apartment buildings, hotels, and golf courses. *Id.,* ch. 9, at 9–19 – 9–26.

The basic mechanics of the methodology are as follows: An assessor first determines the net annual income of the property. This figure is reached by deducting estimated operating expenses from the property's gross income. The assessor also selects a capitalization rate by considering the discount and recapture rates suitable for such an investment as well as the applicable effective tax rate. Finally, the assessor applies a capitalization rate to the net annual income to yield the present value of the expected income stream over the life of the property. *Id.,* ch. 7, at 7–20. *See also Encyclopedia of Real Estate Appraising,* ch. 3, at 41–44 (1978).

In applying the income approach, an assessor will typically base the calculations on an expected stream of

561

rental income. *See* 1 *Property Assessment Manual for Wisconsin Assessors,* ch 3 at 7–20. Indeed, the *Property Assessment Manual for Wisconsin Assessors* outlines the steps to follow under the income method, a number of which seemingly assume the use of rental income. *See* 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 9, at 9–6 – 9–8. Other guides to property appraisal provide similar descriptions of the analysis required under the income approach. *See, e.g., Encyclopedia of Real Estate Appraising,* ch. 3, at 41–42. Thus, for example, when valuing land upon which an apartment building or commercial structure has been built, an assessor premises calculations on the income generated by the owner of the property in leasing space to the residential or commercial tenants. Given an appropriate deduction for management and other expenses, an assessor can assume that the net rental income is a product of the property itself. Applying a capitalization rate to the net stream of rental income, therefore, yields the present value of the real estate alone. *See* 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 9, at 9–19 – 9–23.

■■■■

Wisconsin law does not preclude an assessor from using owner-operator income to value real estate in circumstances in which no stream of rental income exists.[12] On the contrary, the *Property Assessment Manual for Wisconsin Assessors* appears to anticipate the use of owner-operator income with respect to owner-occupied and operated real property when insufficient market data exists to provide a reliable basis for

---

[12] The Wisconsin cases allowing consideration of income in valuation of real estate for tax purposes do not limit income to rental income although the facts of the cases seem to involve rental income.

extrapolating a market lease rate. 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 9 at 9–26, ch. 11, at 11–31.

We are aware of no Wisconsin case suggesting an absolute bar to an assessor using, along with other methods, owner-operator income to value real estate in circumstances in which no stream of rental income exists. The recent court of appeals decision in *N/S Associates v. Village of Greendale,* 164 Wis. 2d 31, 473 N.W.2d 554 (Ct. App. 1993), while distinguishable on its facts from this case, demonstrates that Wisconsin law does not necessarily preclude an assessor from considering business or going concern value in estimating the value of real estate. In *N/S Associates,* the owner of a shopping mall suggested that a recent sale price of the mall was an improper basis for assessing the property, arguing that the sale price reflected not only the value of the real estate but also the value of the mall as a going concern. 164 Wis. 2d at 52. The court of appeals refused to reject outright the inclusion of business value, however. Instead, the court of appeals suggested that an assessor must first determine whether the business value is generated by the property itself and thus "appended" to the property as part of its "transferable income-producing capacity." *Id.* at 54. According to the court of appeals, an assessor may include any value attributable to such transferable income-producing capacity as part of the basis for assessing the real estate. *Id.* at 55. Because the mall's sole reason for existence was to lease space to commercial tenants, the court of appeals concluded that any business value reflected in the sale price was "inextricably intertwined" with the real estate and thus could be assessed as part of the real estate. *Id.*

Waste Management contends that *N/S Associates* is limited to cases involving an attempt to subtract "business value" from the value set by a recent arm's-length sales transaction. Regardless of its proper interpretation, *N/S Associates* appears to recognize that certain business value may in fact be "appended" to the real estate rather than personal to the owner. According to the reasoning of the court, such appended value is "inextricably intertwined" with the land and is transferred to the new owner upon a sale of the land.

The concept of business value being appended to the real estate is also informed by this court's decision in *Leathem Smith Lodge, Inc. v. State,* 94 Wis. 2d 406, 288 N.W.2d 808 (1980), a condemnation case involving a dispute over the proper valuation of a resort property. In *Leathem Smith,* we declined to admit evidence of the resort's value based on the net owner-operator income because evidence of comparable sales existed. 94 Wis. 2d at 414. Although we suggested that net income is ordinarily not a reliable indicator of value in condemnation proceedings, we noted that an exception is made when "(1) the character of the property is such that profits are produced without the labor and skill of the owner, (2) profits reflect the property's chief source of value, and (3) the property is so unique that comparable sales are unavailable." *Leathem Smith Lodge, Inc.,* 94 Wis. 2d at 413 (citing 5 Nichols, *Eminent Domain* (3rd ed.), section 19.3(5), at 354; *Mancheski v. State,* 49 Wis. 2d 46, 50, 181 N.W.2d 420 (1970); and *Lambrecht v. State Highway Comm.,* 34 Wis. 2d 218, 226–27, 148 N.W.2d 732 (1967)). Although the language in *Leathem Smith* differs from that in *N/S Associates,* the first two of the three exceptions in *Leathem Smith* clearly correspond to the ideas articulated in *N/S Associates.* Thus

our case law recognizes that, in certain circumstances, a property's income-producing capacity (aside from rental value) may be used in valuation of real estate.

We emphasize that an assessor's task is to value the real estate, not the business concern which may be using the property. The *Property Assessment Manual for Wisconsin Assessors* advises assessors to estimate and subtract non-real estate values when using the income approach to valuation. The *Manual* appropriately cautions assessors, for example, to be aware when using income to value hotels that the amount of net income may be affected by the quality of the hotel's management or goodwill. 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 9, at 9–24.

Likewise, although the court of appeals in *N/S Associates* reasons that certain business value may be attributed to the transferable income-producing capacity of the underlying land, the decision recognizes that other business value, attributable to the enterprise skill and acumen of the owner, can not be considered part of this transferable income-producing capacity. 164 Wis. 2d at 55.[13]

We expect that the income approach based on net owner-operator income is permissible only in very limited circumstances under sec. 70.31(1), Stats. 1989–90. Given a recent sale of the subject property or sales of reasonably comparable properties, or a valid cost approach, the use of the owner-operator income approach was not appropriate. If no such sales existed, or if the data provided by the market and cost

---

[13] Indeed, the court made reference to the *non*-transferable income-producing capacity, concluding only that the record before it established that the mall's non-transferable business value could not be separated from that which was appended to the land and thus was taxable with the land. *Id.*

approaches were of dubious reliability, income could be considered, but only as one of a number of elements. The property must be such that the net income reflects the property's chief source of value. Further, either the net income must be produced without the labor and skill of the owner or the net income attributed to labor and skills must be factored out. Even then, the results reached through the income approach must be reconciled with estimates of value identified by other approaches or elements considered.

We now return to the specific dispute giving rise to this review and examine the Kenosha County Assessor's use of the income approach based on owner-operator income under the circumstances at bar. The substance of Waste Management's objection is that the use of this approach impermissibly included business value generated in the operation of the Pheasant Run landfill in the assessment of the real estate. The board and the Assessor concede that appraisers must distinguish between real estate values and non real estate values. The essence of their position, however, is that the Assessor's and board's determination satisfactorily accounted for the non-transferable business value, if any, generated by Waste Management.

A court's function is not to make an assessment of the real estate or to substitute its judgment for that of a board of review. Instead, a court's duty is to set aside a board of review's determination if it finds upon the undisputed evidence that the assessment was not established in accordance with sec. 70.32(1), Stats. 1989–90. If the statute was followed and any reasonable view of the evidence as a whole supports the assessment, the assessment will be upheld.

We conclude that the board followed sec. 70.32(1), Stats. 1989–90, and a reasonable view of the evidence as a whole supports the board's determination in this case. We therefore uphold the determination of the board of review and affirm the decision of the court of appeals.

It is clear from the record that the Pheasant Run landfill is an atypical commercial property. No recent sales of this property or comparable property exist. The experts point out that the cost approach is not helpful in this case. Waste Management does not rent the landfill, but instead successfully operates the site itself. More importantly, the record contains no evidence of local rental arrangements involving landfills.[14] Under these circumstances, an assessor must determine market value from the best information the assessor can practicably obtain. At a minimum, therefore, the board did not err by looking beyond the evidence presented by Waste Management to consider the income generated by the company as both owner and operator of the landfill.

Neither party disputes that the highest and best use of the two parcels upon which the landfill is located

---

[14] Data drawn from landfills leased in the Southern California area suggest that a landfill owner who leases a landfill site to another operator is typically able to demand between 10 to 20 percent of the lessee-operator's gross revenues in return. Moreover, the *Encyclopedia of Real Estate Appraising,* a well-known source relied upon by the Assessor, references a market lease rate of 20 to 30 percent of the lessee-operator's gross revenues. *See Encyclopedia of Real Estate Appraising,* ch. 50, at 1086. While informative, neither range of lease rates is based on data drawn from the market in which Pheasant Run competes. As a result, the record does not definitively establish a lease rate applicable to Waste Management's landfill operation.

is as a landfill site. A purchaser of the property is unlikely to use the land as anything other than a site for dumping waste. As a result, the value of the land appears to lie in its ability to receive waste over the remaining life of the landfill. To phrase it another way, the net income from receiving waste reflects the property's chief source of value.

Moreover, Pheasant Run is presently fully licensed by the Department of Natural Resources as a sanitary landfill site. A landfill license is specific to the site, and the operator of a licensed landfill may neither carry the license with it nor transfer the license to a successor owner upon a sale of the landfill property. Under section 144.444, Stats. 1991–92, the Department of Natural Resources shall grant a new license to a successor owner of the site if "the new licensee meets all the requirements specified in the previous license, the approved plan of operation, if any," and other legal mandates. As an approved and presently licensed site, therefore, with the myriad of applicable local zoning and state siting processes long ago completed, Pheasant Run has an inherent capacity to accept waste that would not be present in other sites not presently approved and licensed. Although the license itself may not be transferred with the land, certainly this inherent value passes to a new owner. In so reasoning, we do not mean to suggest that the landfill license is itself an interest in real estate. We merely recognize, as did the Assessor and the board, that, as a practical matter, a potential purchaser of the Pheasant Run property would attach some value to the fact that the site is presently approved and licensed.

It is fair to assume as well that a competent level of management will produce an income stream similar to that generated by Waste Management. Sophisticated

operators exist in the marketplace. Evidence reveals that the tipping fees charged by Waste Management at the Pheasant Run site are comparable with, if not slightly below, standard industry rates. Overall, the record is clear in demonstrating that the landfill industry has become increasingly profitable over the last few years, as demand for economical and environmentally sound disposal of waste has risen. Such evidence of increased demand undermines Waste Management's suggestion that a new owner would have to survive without at least 50 percent of the present traffic flow at Pheasant Run. The trucks presently using the site may choose to dump elsewhere under new ownership, but other haulers would presumably adjust their practices to take advantage of greater space at Pheasant Run.

Thus, from this record we conclude that the board of review could reasonably have determined that a significant portion of the income generated at the Pheasant Run site was attributable to the transferable income-producing capacity of the underlying land itself, and not to the labor and skill of the owner. We do not suggest, however, that such reasoning would prove convincing in circumstances different from those presented in the case at bar. The record before us suggests that a landfill may be a unique type of property in this respect.

Even in the case of a landfill, some element of net income may be attributed to the business enterprise operating on the site. The task in appraising the value of the property, therefore, is to determine the extent of such business value. In the case at bar, Waste Management and the Assessor introduced substantial but conflicting testimony regarding this very question. Foreman's article and the Assessor's calculations support one method of accounting for non-transferable

income producing capacity; both apparently accounted for non-transferable business value within the exclusion of expenses and the choice of a capitalization rate under the income approach. Dr. Karvel concluded that the Assessor's calculations excluded management services and a profit for such services. Foreman's testimony before the board of review identified the non-transferable business value as the difference between owner-operator income ($18 million according to Foreman) and one reached by using rental income (according to Foreman, $6 million in this case). Thus according to Foreman, $12 million was business value. Waste Management's other experts did not attempt to quantify the non-transferable business value of the landfill property. The board of review had conflicting appraisals based on diverse approaches. The board of review could reasonably have concluded that the Assessor's calculations adequately accounted for any business value unrelated to the real estate.

Waste Management also contends that the assessment violates the state constitution's uniformity clause, arguing that were the court to affirm the board's determination, the board would be taxing intangible business and licenses to some property taxpayers and not others. This argument fails. The assessment of this property, like all property, is based on full market value.

We conclude that on this record the board of review clearly kept within its jurisdiction and acted according to law. Furthermore, there was evidence before the board that would reasonably support its decision; its decision was not arbitrary, oppressive or unreasonable.

For the reasons set forth, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.