NORTHLAND WHITEHALL APARTMENTS
LIMITED PARTNERSHIP,
Plaintiff-Appellant,

v.

CITY OF WHITEHALL BOARD OF REVIEW,
Defendant-Respondent.

Court of Appeals

*No. 2004AP2941. Submitted on briefs April 20, 2005.
—Decided February 23, 2006.*

2006 WI App 60

(Also reported in 713 N.W.2d 646.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Matthew J. Fleming* and *Larry E. Bechler* of *Murphy Desmond S.C.*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Bruce J. Kostner* and *Bryan E. Tillman* of *Kostner, Koslo & Brovold, LLC*, Arcadia.

Before Dykman, Vergeront and Deininger, JJ.

¶ 1. DEININGER, J. This dispute involves the assessed value of a subsidized housing complex. The circuit court upheld the City of Whitehall's 2003 assessment of the property, as confirmed by the City's board of review. The owner of the apartments, Northland Whitehall Apartments Limited Partnership, appeals the circuit court's order that denied relief and dismissed its petition for certiorari review of the assessment. Northland complains that the city's assessment was based on

improper comparison sales and that the board of review ignored the only valid evidence of the apartments' value, that being Northland's appraisal utilizing the income approach to value the property.

¶ 2. We agree that the city assessor's justification of the City's assessment, as set forth in the record of the board of review proceedings, does not comport with the statutory mandate that property be assessed according to its market value. Specifically, the assessor provided no basis for board members to conclude that the comparison sales he relied on fulfilled the requirement that the comparisons be "recent arm's-length sales of reasonably comparable property." WIS. STAT. § 70.32(1) (2003–04).[1] The assessor also did not challenge either the method or data utilized in Northland's income-based appraisal. We thus conclude the board could not reasonably make the determination it did on the record before it. We therefore reverse the appealed order and direct that Northland's 2003 assessment be remanded to the board of review for further proceedings consistent with this opinion. We decline, however, Northland's request that we direct the circuit court to sanction the board for presenting a frivolous defense.

## BACKGROUND

¶ 3. This case is before us on certiorari review of the board of review's determination confirming the City's 2003 assessment of Northland's property. *See* WIS. STAT. § 70.47(13). Accordingly, our background summary is taken from the record made during the proceedings before the board.

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

¶ 4. The City of Whitehall assessed the twenty-six unit Creekside Apartments, owned by Northland, at $590,300 for 2003. Northland filed a timely notice of objection to the assessment. *See* WIS. STAT. § 70.47(7)(a). When the board of review convened to hear Northland's objection, the Whitehall City Assessor and an agent of Northland were sworn to give testimony. Northland's agent presented the board a written appraisal, prepared by a certified appraiser, that valued the property at $188,000 utilizing the "income approach."

¶ 5. Northland's agent told the board that the property in question was a "Rural Development Section 515 subsidized housing project." He explained that the property was therefore subject to numerous limitations that restricted the rent that could be charged for apartments, the income the owners could realize from the property and the manner in which they could dispose of the property. He also stated that the project had been experiencing a vacancy rate of approximately thirty percent. Northland's agent then described how the $188,000 appraised value was derived through the income approach, the appraiser having concluded that (1) the buildings' age militated against the cost approach, and (2) no recent arms-length sales of comparable properties were available to utilize in establishing the value of the property. He also read excerpts from the State of Wisconsin Property Assessment Manual (Rev 12/00) to the board, including the following from page 9–30: "The income approach is the most useful and often the only method for valuing subsidized housing because of the conditions of the agreement and the limited availability of data."[2]

---

[2] The excerpts of the Wisconsin Property Assessment Manual contained in the record are from the version identified

¶ 6. After Northland's agent had explained the appraisal's use of income and expense data and a capitalization rate to arrive at $188,000 for the parcel's value through the income approach, the city's assessor was asked to explain the basis of his assessment. He provided the board a sketch of the apartment buildings, showing their dimensions, as well as a "cost sheet" that he testified "was set up when we did the revaluation [work] back in 1998 . . . . I have not made any adjustments to it . . . ." The "cost sheet" showed a value of $666,000.[3] He explained that he typically looks to see if "all three of the approaches" ("the cost approach, the income approach, and . . . the comparable sales approach") produce a similar value, which he testified should occur "[i]f the values are somewhat correct."

¶ 7. The assessor went on to state his view that, because the property in question is subsidized housing subject to numerous restrictions, "[t]he definition of market value . . . kind of goes out the window . . . ." For example, he pointed to a comment in the Property Assessment Manual to the effect that, when a subsidized housing project is owned by a limited partnership, as is the case here, the owner's "objective is to maximize

_____

as "Revised 12/00." In the balance of this opinion, we refer exclusively to the version identified as "Revised 12/04," which we cite as "WPAM (Rev 12/04)." The sentence quoted in the text appears at page 9–39 of WPAM (Rev 12/04).

[3] Although the 2003 assessed value of the property was $590,300, its "equalized value" was apparently $658,800. We explained in *State ex rel. Kesselman v. Sturtevant*, 133 Wis. 2d 122, 131–32, 394 N.W.2d 745 (Ct. App. 1986), that "[e]qualization is the state Department of Revenue's independent evaluation of the total value of real property within a municipality," and that "[e]qualized value is not a measure of fair market value of a particular parcel within the municipality but rather is a test of the local assessor's overall valuations."

losses and tax credits and not to obtain cash flow or long term appreciation." Thus, in the assessor's view, the income approach "may skew the overall value of the project in terms of what it's real market value is." Also, because one of the restrictions applicable to the property was that its owners must first offer it for sale to not-for-profit organizations, the assessor stated his belief that such sales should be used as comparables, even though he would "normally" tend to disregard sales to such organizations.

¶ 8. With the foregoing as a prelude, the assessor then described how he had obtained information on new construction and sales of existing rural subsidized housing projects from the federal office that oversees Rural Development housing projects in Wisconsin. He pointed to his computation of the per-unit construction cost of twelve new subsidized housing projects constructed in Wisconsin since 1995, which averaged $38,600 per unit. He acknowledged that he viewed this figure as somewhat inflated because of the inclusion of such things as architectural and contractor fees and various federal requirements that would exceed "what a . . . normal commercial apartment building would . . . have to have."

¶ 9. The assessor next described his calculation of the per-unit price for the rural subsidized housing projects in Wisconsin that had been sold since 1995, again based on the information received from the federal office. Sixteen such sales were identified, but the assessor excluded several "identity of interest" sales, which were apparently transactions among related entities, and three "forced sales." This left projects encompassing "66 units" that had been sold since 1995 for "an average unit price of $30,286.00." When the forced sales were included, there were 106 units sold for an average

of $25,394. The assessor summarized his conclusion regarding the value of the property in question on the basis of the cited sales data:

> In looking at that, . . . I felt that, you know, the value that we had for the 26 units in Whitehall of ratioed [sic] to full-market value of, approximately, $25,000.00. This could end very, very close. That would come up with a market—full-market value of about $680,000.00 [sic], and that's darn close to where I am, and I feel that that's where we should be.

¶ 10. In response to questions from board members, the assessor acknowledged that sales occurring as long as eight years ago "were probably older than I'd like," but he believed them valid indicators of current value because they represented the only sales in Wisconsin of similarly-restricted housing projects during the past eight years: "I felt that there was less of a chance that they have to make any adjustments to the actual market value." The assessor also justified his method by noting that, in a 2002 letter, the Secretary of the Wisconsin Department of Revenue said that "Wisconsin law requires assessors to use the Sales Comparison Approach if sales are available." As to the statement in the Property Assessment Manual that the "income approach is the most useful and often the only method for valuing subsidized housing," the assessor replied:

> I was supplied the income approach [from Northland's appraisal], but . . . in trying to get the three approaches to be somewhat comparable, this was way out in the woods, you know, at $188,000.00, whereas the—the actual sales were coming in at about $25,000.00 per unit, and if we made adjustments to the original cost, that would probably BE [sic] more in line with the $25,000.00 per unit . . . .

495

It's how I feel. In looking at the sale, if the sale weren't there, then I would have been obligated to have to use the income approach.

¶ 11. Board members asked several more questions of the two witnesses. In response to a question, Northland's agent told board members that the sales used by the assessor "don't fit the definition of an arms-length sale, [and] they shouldn't be used, because they did not take place on the open market." He explained that, in his view, the requirement that the properties first be offered to "non-profit agencies . . . that's not the open market." When the assessor was asked whether he disputed how Northland's appraiser "arrived at his value in the income approach," the assessor replied, "No." When asked whether he was "standing by [his] assessment," the assessor replied that he was because, "[i]n looking at the . . . sales and including the forced sales, okay, and I'm showing a $25,000.00 per unit value, it fits right in with the old assessment, so at that point I would say, yes."

¶ 12. When it appeared there were no further questions, a board member stated his "feeling that [the assessor] is right . . . on what he presented here today" and moved to "deny the . . . appeal." The motion carried, and the subsequent "Notice of Board of Review Determination" informed Northland that its final 2003 assessment would remain at $590,300 as originally determined by the City. Northland timely commenced this action for certiorari review. The circuit court entered an order denying relief in which it stated that it "cannot conclude that the City of Whitehall Board of Review acted unreasonably in adopting the comparable sales evidence of the assessor, rather than the income valuation utilized by the expert for [Northland]." Northland appeals.

## ANALYSIS

¶ 13. As we have recently explained, when deciding an appeal of a circuit court order entered on certiorari from a board of review's property tax assessment, we review the " 'record made before the board of review,' " not the circuit court's decision. *See Mineral Point Valley Ltd. P'ship v. City of Mineral Point Bd. of Review*, 2004 WI App 158, ¶ 5, 275 Wis. 2d 784, 686 N.W.2d 697 (citing *Nankin v. Village of Shorewood*, 2001 WI 92, 20, 245 Wis. 2d 86, 630 N.W.2d 141). In our review, we look for "any error in the proceedings of the board which renders the assessment or the proceedings void," *see* Wis. Stat. § 70.47(13), and we are limited to considering four factors: (1) Whether the board acted within its jurisdiction; (2) whether the board acted according to law; (3) whether the board's action was arbitrary, oppressive or unreasonable, representing its will rather than its judgment; and (4) whether the evidence was such that the board might reasonably make the order or determination in question. *Mineral Point*, 275 Wis. 2d 784, ¶ 5.

¶ 14. Northland's challenge to the board's 2003 assessment of its subsidized housing complex focuses on the second and fourth factorswhether the board acted according to law and whether the evidence before it was sufficient to permit it to reasonably affirm the city's 2003 assessment. We will uphold the assessment if it was " 'made in accordance with the statutory mandate' " and " 'if it can be supported by any reasonable view of the evidence.' " *Id.* Moreover, like the circuit court, we cannot independently determine a property's assessment but must remand to the board for further

proceedings if error is present that renders the assessment void. *See id.*; Wis. Stat. § 70.47(13) ("If the court on the appeal finds any error in the proceedings of the board which renders the assessment or the proceedings void, it shall remand the assessment to the board for further proceedings in accordance with the court's determination.").

■

¶ 15. Northland argues that the 2003 assessment of its property does not comport with the law because the assessor did not determine the property's fair market value. *See State ex rel. Kesselman v. Sturtevant*, 133 Wis. 2d 122, 132, 394 N.W.2d 745 (Ct. App. 1986) ("The assessor is required to assess property based on fair market value." (citing Wis. Stat. § 70.32(1))). According to Northland, the assessor admitted he did not determine the property's fair market value when he told board members that, for subsidized housing, the "definition of market value . . . kind of goes out the window" and that he took "greater latitude in defining what market value actually is." Instead, the assessor sought to justify the City's prior assessment with sales of allegedly comparable properties, which Northland contends "were not open-market, arm's-length transactions" as required by Wis. Stat. § 70.32(1), which provides as follows:

> *Real property shall be valued by the assessor* in the manner specified in the Wisconsin property assessment manual provided under s. 73.03 (2a) from actual view or from the best information that the assessor can practicably obtain, *at the full value which could ordinarily be obtained therefor at private sale.* In determining the value, *the assessor shall consider* recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those

498

sales conform to recent arm's-length sales of reasonably comparable property; *recent arm's-length sales of reasonably comparable property;* and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

(Emphasis added.)

¶ 16. Northland acknowledges the existence of a hierarchy among the three assessment techniques recognized in the Wisconsin Property Assessment Manual (sales comparison, cost and income approaches). Specifically, if data is available regarding "recent arm's-length sales of reasonably comparable property," *id.,* a value determined on the basis of recent comparable sales must be preferred to a value derived from a property's current income or construction costs. *See, e.g., State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970). Here, however, Northland asserts there were no "recent arm's-length sales of reasonably comparable property" upon which to base the present property's value, and that the value derived by its appraiser utilizing the income approach stands, unrefuted, as the only valid evidence before the board of review as to the property's current fair market value.

¶ 17. An "arm's-length" or "market value" sale is one in which the price is determined by a "competitive and open market under all conditions requisite to a fair sale," and one in which the buyer and seller are "acting prudently [and] knowledgeably" and for which "the price is not affected by undue stimulus." *See* WPAM (Rev. 12/04), 7–4. Northland argues that several of the sales relied on by the assessor do not qualify as "arm's-length" because they were accomplished, not on the open market, but to not-for-profit organizations pursuant to federal subsidization program restrictions, and

also because some were "forced sales." The record provides scant information regarding the sales relied on by the assessor, but it is clear that, in arriving at his "$25,000.00 per unit" value, the assessor did rely in part on forced sales and on sales of allegedly comparable subsidized housing projects to not-for-profit organizations.[4] We therefore agree with Northland that the assessor's justification of the City's 2003 assessment by comparison with sales of other subsidized housing projects in Wisconsin since 1995 suffers from the infirmity that several of the transactions he relied on were at other than "arm's-length."[5]

---

[4] One might argue that Northland should not complain about the assessor's use of data from "forced sales" because including them plainly reduced the "per-unit value" the assessor derived from the sales data he considered. The point, however, is not in which direction the inclusion of forced sales, or, for that matter, of sales to not-for-profit organizations pursuant to program restrictions, may have driven the resulting average. Rather, as we have discussed, the law requires that only "recent arm's-length" sales be utilized for sales comparison purposes, and the inclusion of non-market-value transactions in the assessor's comparisons produces a result that cannot be said to reflect a value arrived at through "arm's-length negotiation in the open market, between an owner willing but not obligated to sell, and a purchaser willing but not obliged to buy." *See Dempze Cranberry Co. v. Board of Review of the Village of Biron*, 143 Wis. 2d 879, 884–85, 422 N.W.2d 902 (Ct. App. 1988).

[5] The Wisconsin Property Assessment Manual (Rev 12/04), 7–4, lists five factors that shed light on whether a sale is at "market value." The supreme court noted these factors in *Doneff v. City of Two Rivers Bd. of Review*, 184 Wis. 2d 203, 212, 516 N.W.2d 383 (1994), where it concluded that a property owner who wishes to rely on a property sale as establishing its market value bears the burden of proving that the conditions in the Property Assessment Manual were met "to show that a sale was a market or arm's-length transaction." *Id.* at 216. We conclude

¶ 18. We also conclude that there is another obvious difficulty with the assessor's reliance on the sales data he obtained for sales of subsidized housing projects in Wisconsin since 1995. Setting aside the question of whether sales occurring up to eight years earlier may be deemed "recent," there is simply nothing in the record from which the board of review could conclude that the other properties were "reasonably comparable," as required under Wis. Stat. § 70.32(1). True, all shared with Northland's property the characteristic that they were federally subsidized rural housing projects, and thus, were presumably subject to the same or similar types of restrictions as Northland's apartment complex. Beyond that, however, the bare listing of locations and numbers of units for the alleged "comparables" is all that we, the board, or the assessor know about the other properties from the present record.

¶ 19. The Wisconsin Property Assessment Manual advises assessors that, when utilizing the "sales comparison approach," comparable properties should be "properties that represent the subject property in *age, condition,* use, *type of construction, location, number of stories,* physical features and economic characteristics" (emphasis added). WPAM (Rev 12/04), 7–18.[6] The record con-

---

that, regardless of whether a municipality that seeks to rely on sales of allegedly comparable properties is under a similar burden (a question we do not decide), it must, at a minimum, not knowingly rely on sales that do not meet the requisite conditions.

[6] The supreme court has described the elements of "comparability" this way:

Quite obviously, 'reasonable comparability' depends upon the degree of similarity between the properties in question. Important considerations in determining whether particular property is sufficiently similar to the property being assessed to warrant

tains no information regarding how the several housing projects relied on by the assessor compare to Northland's with respect to any of the emphasized characteristics.

¶ 20. Moreover, the Manual, under the heading "SUPPLY AND DEMAND," observes that "if there were an increase in residential construction while the population remains stable or decreases, the market value of residential property would probably decrease." WPAM (Rev 12/04), 7–9. Northland's agent testified that its apartments were experiencing a thirty percent vacancy rate, due in part to the apparently ample availability of comparably priced rental units in the Whitehall area. Nothing in the record establishes whether the allegedly comparable housing projects were in high- or low-demand areas or were subject to higher, lower or comparable vacancy rates.

¶ 21. Finally, we note that the assessor applied no "adjustments" of any kind to the sales prices of the allegedly comparable housing projects in order to account for any differences among the other properties and Northland's. Indeed, he could not have intelligently done so given the paucity of information available regarding the other properties and their sales. *See Joyce v. Town of Tainter*, 2000 WI App 15, ¶¶ 20–23, 232 Wis. 2d 349, 606 N.W.2d 284 (noting that "even sales prices of similar properties need some adjustments in order to

reliance on its sale price as evidence of market value include its location, including the distance from the assessed property, its business or residential advantages or disadvantages, its improvements, size and use. It is also important to consider the conditions of sale, including its time in relation to the date of valuation, and its general mode and character insofar as they tend to indicate an arm's-length transaction.

*Rosen v. City of Milwaukee*, 72 Wis. 2d 653, 665, 242 N.W.2d 681 (1976).

arrive at an estimate of value for a different property," and that the Manual provides guidance regarding adjustments that may be needed).

¶ 22. Given that comparison sales, if available, provide the preferred method of determining a property's market value, we do not fault the assessor for attempting to obtain comparison sales data from which to derive the current market value of Northland's subsidized housing complex. The assessor, however, improperly relied on the data he obtained for sales of other subsidized housing projects in Wisconsin since 1995 to justify the City's 2003 assessment of Northland's property. The record provides no basis to conclude that the sales the assessor utilized consisted of "recent arm's-length sales of reasonably comparable property," as required by WIS. STAT. § 70.32(1). In fact, the assessor's testimony and exhibits establish that he complied with neither the statutory directive nor the Property Assessment Manual's guidance regarding the use of comparable sales to establish a given property's market value.

¶ 23. The only other information the assessor provided to the board, besides the sales data discussed above, consisted of several hand-drawn sketches of the exterior dimensions of the improvements on the property and a two-page work sheet that was apparently utilized in establishing the assessment for the apartment complex in 1998. The work sheet appears to calculate the "insurable value" of the improvements based on their dimensions and standard cost-based factors or formulae, but the assessor gave no explanation of the document. Neither did he provide a basis for the board to believe that the figure derived on the 1998 worksheet represented the 2003 market value of the property, save for his sales comparison analysis, which we have described and rejected above because it did not

comply with statutory directives and Manual guidance. We do not go so far as Northland, which accuses the assessor of "starting from his totally subjective unadjusted opinion of value and then manipulating his data to support his pre-existing opinion." We do conclude, however, that "the assessor based his valuation on improper considerations or went upon a false assumption or theory in determining the amount," and thus failed to "make the assessment on the statutory basis," requiring that we set aside the assessment before us. *See Kesselman*, 133 Wis. 2d at 127–28.

¶ 24. Even though the record is devoid of proper support or justification for the City's 2003 assessment, we might still be able to affirm the board's determination to confirm the assessment if there were no proper evidence in the record establishing a different value for the property. *See* Wis. Stat. § 70.49(2) ("[I]n all actions and proceedings" involving assessed values, the value entered in the assessment roll is "presumptive evidence" that a property has "been justly and equitably assessed."); *Dempze Cranberry Co. v. Board of Review of the Village of Biron*, 143 Wis. 2d 879, 884, 422 N.W.2d 902 (Ct. App. 1988) ("We must consider the evidence of value before the board of review in the light of the presumption of correctness of the assessor's valuation.") The assessor's presentation, however, was not the only evidence before the board regarding the value of Northland's property.

¶ 25. Northland's representative presented the board with an appraisal from a certified appraiser, explained its basis and gave reasons why the appraisal constituted a fair determination of the property's market value and why the assessor's sales comparisons did not. The assessor did not challenge the method or manner in which Northland's appraisal was prepared,

noting that he rejected it only because it produced a value that did not comport with the assessor's view of the property's value ("this was way out in the woods, you know"). As the board was aware from the testimony and exhibits presented to it, the Property Assessment Manual endorses the "income approach" as "the most useful and often the only method for valuing subsidized housing." WPAM (Rev 12/04), 9–39. And, as Northland points out, the "income approach" as utilized by its appraiser has also been recognized by the courts or parties in several published appellate opinions as a valid method of determining the value of subsidized housing projects. *See Metropolitan Holding Co. v. Board of Review of the City of Milwaukee*, 173 Wis. 2d 626, 495 N.W.2d 314 (1993); *Mineral Point Valley Ltd. P'ship v. City of Mineral Point*, 2004 WI App 158, 275 Wis. 2d 784, 686 N.W.2d 697; *Bloomer Housing Ltd. P'ship v. City of Bloomer*, 2002 WI App 252, 257 Wis. 2d 883, 653 N.W.2d 309.

¶ 26. In sum, this is not a case where the taxpayer failed to overcome the presumption of an assessment's correctness. We conclude that the evidence before the board was such that the board could not reasonably make the determination that it did. *See Mineral Point*, 275 Wis. 2d 784, ¶ 5. For the foregoing reasons, we reverse the appealed order and direct that, on remand to the circuit court, the matter of the 2003 assessment of Northland's property be further remanded to the City of Whitehall Board of Review for further proceedings consistent with this opinion. *See* Wis. Stat. § 70.47(13). We do not wish to suggest that, on remand, the board must accept Northland's appraisal as establishing the 2003 assessment. We conclude only that, on the present record, the board had no proper basis for rejecting that value in favor of the City's assessment.

¶ 27. Northland also complains that the circuit court "erred when it failed to find the board's defense of this action frivolous." The circuit court could hardly have so found, however, given that it upheld the board's determination. Northland nonetheless asks us, in addition to remanding to the board to re-determine the 2003 assessment, to direct that the circuit court impose sanctions against the board and/or its attorney under Wis. Stat. § 814.025.[7] We decline to do so. Although we recognize Northland's frustration with what it views as the board's obstinacy in not confessing error, and with some of the board's arguments that can charitably be characterized as strained,[8] we cannot conclude that the board's attempt to have its determination upheld on judicial review is sanctionable as a frivolous defense.

[7] Effective July 1, 2005, the former Wis. Stat. §§ 802.05 and 814.025 were repealed and a revised § 802.05 was created. See Wisconsin Supreme Court Order No. 03–06, 2005 WI 38 (Mar. 31, 2005).

[8] For example, the board argues that only a sale of the subject property needs to be an arm's-length transaction in order to be considered for assessment purposes, and that "Wisconsin law does not require the comparable sales to be at arm's-length." In support, the board cites the following sentence from Waste Mgmt. of Wisconsin, Inc. v. Kenosha County, 184 Wis. 2d 541, 516 N.W.2d 695 (1994): "A recent arm's-length sale of the subject property, or sales of reasonably comparable land, represent the best information with which to determine fair market value." Id. at 556.

Waste Management (which primarily dealt with an assessor's use of the income approach, which the court upheld) in no way supports the board's dubious proposition. The sentence in question must be read to apply the "recent arm's-length" qualifier to both "sale of the subject property" and to "sales of reasonably comparable land." This becomes apparent

¶ 28. As we have explained, an assessor's valuation of a property comes before both the board of review and a reviewing court clothed with a presumption that it is "correct." Moreover, the board's resolution of conflicts in testimony regarding the correctness of the assessor's valuation is entitled to considerable deference—" '[i]f there is credible evidence before the board that may in any reasonable view support the assessor's valuation, that valuation must be upheld.' " *Rosen v. City of Milwaukee*, 72 Wis. 2d 653, 661–62, 242 N.W.2d 681 (1976) (citations omitted). Given this presumption and standard for judicial review, we would find it difficult to conclude, in the absence of a showing of bad faith, that the board of review or its attorney should be sanctioned for attempting to defend in court the board's determination confirming the assessor's valuation.

¶ 29. The City's assessor provided evidence to the board to support his assessment, and that evidence purportedly accorded with the "preferred" method of

when one views the footnote on the preceding page of the opinion that quotes the recently enacted language in Wis. Stat. § 70.32(1) directing assessors to consider, among other things, "recent arm's-length sales of reasonably comparable property." *Id.* at 555 n.8. Thus, the board's argument on this particular point may well be frivolous, inasmuch as it directly contradicts the plain language of the governing statute, not to mention the Property Assessment Manual (see WPAM (Rev 12/04), 7–18, 19) and, in Northland's view, common sense. A single frivolous argument, however, does not render an entire claim or defense frivolous. *Cf. Baumeister v. Automated Products, Inc.*, 2004 WI 148, ¶ 26, 277 Wis. 2d 21, 690 N.W.2d 1 (noting that a frivolous argument in a brief is not enough to find an entire appeal frivolous).

determining a property's value—sales comparisons. Although we conclude that the assessor's evidence did not comply with legal requirements for assessing property in Wisconsin, this does not mean that the board should not be allowed to try to convince a court otherwise. The board's defense succeeded in one court, and although the need to reverse and remand for further proceedings before the board does not appear to us to be a close question, we cannot say that the board's defense was so devoid of merit as to invite sanctions for frivolousness. "A claim is not frivolous merely because . . . [it] was later shown to be incorrect." *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 551, 597 N.W.2d 744 (1999) (citation omitted); *see also Chase Lumber and Fuel Co. v. Chase*, 228 Wis. 2d 179, 212–13, 596 N.W.2d 840 (Ct. App. 1999) (noting our traditional reluctance to find an action frivolous, even when a ruling for an opponent is not "a close call").

## CONCLUSION

¶ 30. For the reasons discussed above, we reverse the appealed order and remand to the circuit court with instructions for further remand to the City of Whitehall Board of Review, which is to conduct further proceedings consistent with this opinion regarding the 2003 assessment of Northland's property.

*By the Court.*—Order reversed and cause remanded with directions.