# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2947 |
| COMPLETE TITLE: | Regency West Apartments LLC, <br>       Plaintiff-Appellant-Petitioner, <br>   v. <br> City of Racine, <br>       Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT APPEALS

| | |
|---|---|
| OPINION FILED: | December 22, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Gerald P. Ptacek |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, J., joined by BRADLEY, A. W., J. dissent |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there was a brief by *Maureen A. McGinnity* and *Foley and Lardner LLP*, Milwaukee, and oral argument by *Maureen A. McGinnity*

For the defendant-respondent, there was a brief by *Robert E. Hankel*, and *Robert E. Hankel, S.C.,* Mount Pleasant., *John M. Bjelajac*, and *Bjelajac and Kallenbach, LLC*, Racine and oral argument by *Robert E. Hankel.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP2947
(L.C. No. 2013CV1546 & 13CV1848)

STATE OF WISCONSIN      :      IN SUPREME COURT

Regency West Apartments LLC,

      Plaintiff-Appellant-Petitioner,

    v.

City of Racine,

      Defendant-Respondent.

**FILED**

**DEC 22, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. Regency West Apartments, LLC brought actions against the City of Racine in circuit court pursuant to Wis. Stat. § 74.37(3)(d) (2011-12)[1] to recover refunds from claimed excessive taxation for 2012 and 2013. We review a per curiam, unpublished decision of the court of appeals,[2] affirming an order of the Racine County Circuit

---

    [1] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

    [2] Regency West Apts. LLC v. City of Racine, No. 2014AP2947, unpublished slip op. (Wis. Ct. App. Sept. 16, 2015).

Court[3] that dismissed Regency West's claims of excessive taxation.[4]

¶2 The City of Racine's appraisers valued Regency West's property at $4,425,000 as of January 1, 2012 and at $4,169,000 as of January 1, 2013 for purposes of tax assessment. Regency West claims both appraisals fail to comply with appraisal principles required by Wisconsin law, and that those appraisals resulted in excessive taxation.

¶3 Our discussion centers on whether Racine's appraisals of Regency West's property comply with Wisconsin law. Specifically, we review whether Racine employed the methodology required by Wis. Stat. § 70.32(1) for valuing federally subsidized property that is subject to I.R.C. § 42 restrictions;[5] whether Regency West has overcome the presumption of correctness set out in Wis. Stat. § 70.49; and whether Regency West proved the tax assessments for 2012 and 2013 were excessive.

¶4 We conclude that the valuation methodologies Racine used for the 2012 and 2013 assessments did not comply with Wisconsin law. Accordingly, we also conclude that Regency West has overcome the presumption of correctness for the 2012 and

[3] The Honorable Gerald P. Ptacek of Racine County presided.

[4] Regency West commenced separate refund actions for 2012 and 2013, which were consolidated for trial.

[5] I.R.C. § 42 provides "a dollar-for-dollar reduction in federal tax liability for investors in exchange for equity participation in low-income rental housing." 1 Wisconsin Property Assessment Manual at 9-40; see 26 U.S.C. § 42.

2

2013 tax assessments, and that the circuit court and the court of appeals erred in concluding otherwise. And, finally, we conclude that Regency West has proved that Racine's tax assessments for 2012 and 2013 were excessive. Accordingly, we reverse and remand to the circuit court to calculate the amount of Regency West's refund.

## I. BACKGROUND

¶5 Regency West is the owner and developer of a property located in Racine, Wisconsin. Regency West constructed the property in 2010-11, with the first units placed in service September of 2011, and the project being fully leased in February of 2012.

¶6 The property has 9 two-story buildings consisting of 72 residential units, all of which are family units. All units are federally regulated housing pursuant to I.R.C. § 42. These federal regulations include income and rent restrictions. As part of the restrictions, the property is subject to a Land Use Restriction Agreement (LURA) that provides that for 30 years, 51 of the 72 units are restricted to tenants earning up to 50 percent of the median income in Racine County and 21 are restricted to tenants earning up to 60 percent of the median income in Racine County. The maximum rents that Regency West may charge are set by Wisconsin Housing and Economic Development Authority (WHEDA).

¶7 For purposes of assessing real estate taxes, Racine's appraisers valued Regency West's property at $4,425,000 as of January 1, 2012 and at $4,169,000 as of January 1, 2013.

3

Regency West contested both tax assessments, claiming that the appraisals that underlie the tax assessments did not comply with Wisconsin law. Regency West did not challenge the 2012 assessment before the board of review because Racine did not timely deliver the assessment to Regency West. However, Regency West did challenge the 2013 assessment before the board of review. The board upheld that tax assessment.

¶8 The matter now before us is Regency West's refund action brought in circuit court pursuant to Wis. Stat. § 74.37(3)(d). Therefore, we review the record made in the circuit court and the circuit court's determination, not the determination of the assessor or the board of review. See Nankin v. Vill. of Shorewood, 2001 WI 92, ¶¶24-25, 245 Wis. 2d 86, 630 N.W.2d 141.

¶9 Trial testimony turned on various methods of real estate appraisal by which the value of Regency West could be determined. The City presented testimony from its assessor, Janet Scites, as well as the Chief Assessor for the City of Racine, Ray Anderson. Scites testified that for 2012 she applied a direct capitalization of income approach, using "mass appraisal techniques."[6] With a direct capitalization of income approach to valuation, an appraiser computes the property's net operating income (income less expenses or NOI) and divides it by

---

[6] Mass appraisal techniques have been used to value all properties in a taxing district using uniform benchmarks. Standard on Mass Appraisal of Real Property, 2013, International Ass'n of Assessing Officers.

the applicable capitalization rate (ratio between NOI of comparable properties and their sale prices).[7]

¶10 One of Regency West's construction lenders provided estimates of potential gross income and expenses to Racine for use in the 2012 valuation.  However, Racine's assessor said that the expense projections in that report were too high.  Accordingly, Scites applied a 40 percent estimated expense ratio that she believed was reflective of other Section 42 properties.  She testified that she did so "to stabilize expenses."

¶11 Racine's assessor used a 6 percent capitalization rate derived from market-rate properties, not from the market for Section 42 properties.[8]  To this, Scites added the 2.5 percent property tax rate, for a loaded capitalization rate of 8.5 percent.[9]  Racine's appraisers divided the NOI they calculated based on "stabilized expenses" by an 8.5 percent capitalization rate thereby yielding a value of $4,425,000 for 2012.

¶12 With respect to the 2013 assessment, Racine valued Regency West's property at $4,169,000 as of January 1, 2013.

---

[7] The capitalization rate is an estimate of the rate of return an investor would expect in order to invest in the subject property.

[8] Ray Anderson testified that the capitalization rate was given to them by a brokerage firm in Southeastern Wisconsin.

[9] The Wisconsin Property Assessment Manual (WPAM) requires that an appraiser add the effective tax rate to create the loaded capitalization rate for the subject property when doing an income-based valuation.  1 <u>Wisconsin Property Assessment Manual</u> at 9-23.

The City's assessors used the comparable sales approach, rather than the income approach, to appraise the property. They relied on the sales of three properties, which they claimed were reasonably comparable properties.

¶13 One of the properties, Lake Oakes, had few Section 42 housing units; most were market-rate units. The other two properties the City's assessors relied on, Woodside Village/Albert House and McMynn Tower, had no Section 42 units. Each of those developments was either entirely HUD § 8 housing or HUD § 8 housing with a small number of commercial units.[10] The assessor did not adjust for differences in government restrictions on the different types of federally regulated housing when appraising Regency West's property. Instead, Scites testified that she considered the restrictions for Section 8 and Section 42 properties to be sufficiently similar.

¶14 Racine also presented the testimony of two outside appraisers, Peter Weissenfluh and Dan Furdek. The outside appraisers used four appraisal methods for both their 2012 and 2013 assessments. First, Weissenfluh and Furdek used the comparable sales approach. The appraisers relied on a combination of Section 42 and Section 8 properties, and Furdek

---

[10] HUD § 8 housing has entirely different restrictions than does Section 42 housing. For example, Section 8 properties do not have tenant income or rent restrictions, and the government provides rent subsidies when tenant income is insufficient to pay the rent charged. Compare 42 U.S.C. § 1437f (HUD § 8) with 26 U.S.C. § 42 (I.R.C. § 42).

testified that he believed the restrictions on the properties were irrelevant as long as the rental income from the properties was the same. Next, they used two variations of the income approach: the direct capitalization method and the discounted cash flow method. Finally, they used the cost approach. Each of Furdek and Weissenfluh's valuations resulted in higher valuations than Racine's.

¶15 In contrast, Regency West argued that it had overcome the presumption of correctness afforded the City's tax assessment for two reasons. First, the City had failed to comply with the Wisconsin Property Assessment Manual (WPAM)[11] in its appraisals of Regency West's property as Wis. Stat. § 70.32(1) requires. Second, Regency West presented sufficient contrary evidence that Racine's appraisals were excessive. In that regard, Regency West presented testimony from Michael Lerner and, its appraiser, Scott McLaughlin. Michael Lerner has vast experience working with Section 42 housing whereas Scott McLaughlin specializes in appraising subsidized housing. Relying solely on the income approach, which he explained was consistent with WPAM, McLaughlin appraised the property at $2,700,000 for 2012 and $2,730,000 for 2013.

¶16 At the conclusion of the trial, the circuit court dismissed Regency West's excessive tax claims for both years. The circuit court concluded that Regency West had failed to

---

[11] All references to the Wisconsin Property Assessment Manual are to the 2011 version unless otherwise indicated.

7

overcome Wis. Stat. § 70.49's presumption of correctness given to the 2012 and 2013 tax assessments.

¶17 The circuit court found that Racine did not do an individual valuation of Regency West's property for 2012, but instead, it "applied mass appraisal techniques." The court found that Scites "estimated expenses based upon her experience and used a capitalization rate of 8.5%." The court then concluded that "[d]ue to the number of assessments needed to be done (7,500), the City used mass appraisal techniques, [which was] an appraisal method approved by the Property Assessment Manual for commercial property" in arriving at $4,425,000 as the property's value in 2012.

¶18 The court of appeals affirmed the circuit court's dismissal of Regency West's complaint. With respect to the 2013 assessment, the court rejected Regency West's argument that Section 42 and Section 8 properties are not reasonably comparable for purposes of the comparative sales approach. The court reasoned that both types of subsidized housing are found within the same section of the WPAM, and Racine's assessors had opined that the rents from all the properties were essentially the same. With respect to the 2013 assessment, the court concluded that reliance on market-rate properties for the NOI was immaterial because Racine used the comparative sales approach for that valuation; and for 2012, reliance on a market-rate NOI was reasonable because Regency West was newly constructed and did not have actual expenses to consider.

8

¶19 Consequently, the court of appeals concluded that Regency West had not overcome the presumption of correctness accorded to tax assessments by Wis. Stat. § 70.49 and, therefore, Regency West was unable to show that its 2012 and 2013 tax assessments were excessive.

¶20 We granted Regency West's petition for review and now reverse.

## II. DISCUSSION

### A. Standard of Review

¶21 This is a refund action commenced under Wis. Stat. § 74.37(3)(d). It permits "an aggrieved person to recover that amount of general property tax imposed because the assessment of property was excessive." Wis. Stat. § 74.37(1). A claim for excessive assessment is a "new trial, not a certiorari action." Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶6, 315 Wis. 2d 791, 762 N.W.2d 841. Therefore, "we review the record made before the circuit court, not the board of review." Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶24, 294 Wis. 2d 441, 717 N.W.2d 803 (citing Nankin, 245 Wis. 2d 86, ¶25).

¶22 As we review the record made in the circuit court, we interpret and apply Wis. Stat. § 70.32 to determine whether Racine's appraisals for 2012 and 2013 followed the statute's directives. We also interpret Wis. Stat. § 70.49(2) to determine whether Regency West has overcome the presumption of correctness that attached to Racine's tax assessments. Statutory interpretation and application present questions of

9

law that we independently review, while benefitting from the analyses of the court of appeals and the circuit court. Oneida Cty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶9, 299 Wis. 2d 637, 728 N.W.2d 652; see also Soo Line R.R. Co. v. DOR, 97 Wis. 2d 56, 59-60, 292 N.W.2d 869 (1980).

## B. General Appraisal Principles

¶23 "The power to determine the appropriate methodology for valuing property for taxation purposes lies with the legislature." Walgreen Co. v. City of Madison, 2008 WI 80, ¶19, 311 Wis. 2d 158, 752 N.W.2d 687. Wisconsin Stat. § 70.32(1) provides that "property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual." "The Manual, in turn, provides that '[t]he goal of the assessor is to estimate the market value of a full interest in the property, subject only to governmental restrictions. All the rights, privileges, and benefits of the real estate are included in this value. This is also called the market value of a fee simple interest in the property.'" Walgreen, 311 Wis. 2d 158, ¶20 (quoting 1 Wisconsin Property Assessment Manual (2007) at 7—4).

¶24 The objective of an appraisal is to determine "the full value" that an owner would receive at a "private sale." Wis. Stat. § 70.32(1). For purposes of determining full value, property is separated into seven classifications based on use. Wis. Stat. § 70.32(2). Regency West is residential property. § 70.32(2)(a)1.

¶25 Wisconsin Stat. § 70.32(1) provides the methodological framework that appraisers must follow when appraising property. It delineates a three-tier approach:

> In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

Wis. Stat. § 70.32(1); see also State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970).

¶26 "An assessor has an obligation to follow the three tier assessment analysis." Adams, 294 Wis. 2d 441, ¶47. Nevertheless, this hierarchy of appraisal methods does not permit an assessor to use an appraisal method when insufficient data exist to perform an accurate valuation under that method. To the contrary, an assessor must not appraise a property using unreliable data. Metro. Holding Co. v. Bd. of Review of City of Milwaukee, 173 Wis. 2d 626, 631-32, 495 N.W.2d 314 (1993).

¶27 Under the first tier of appraisal methods set out in Wis. Stat. § 70.32(1), an appraiser should rely on recent arm's-length sales of the subject property to determine the property's value. This approach is universally considered the most reliable method of appraising property. Markarian, 45 Wis. 2d at 686. However, both parties agree that this method is not at issue in the present case because there were no sales of the subject property to consider.

¶28 Under the second tier of appraisal methods, an appraiser values a property by considering recent, arm's-length sales of "reasonably comparable" properties. Id.; 1 Wisconsin Property Assessment Manual at 9-45. The WPAM defines "reasonably comparable" properties as those properties that represent the "subject property in age, condition, use, type of construction, location, design, physical features and economic characteristics." 1 Wisconsin Property Assessment Manual at 7-22.

¶29 Moreover, "if there has been no arms-length sale and there are no reasonably comparable sales [] an assessor [may] use any of the third-tier assessment methodologies." Adams, 294 Wis. 2d 441, ¶34. "The income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework." Id., ¶35.

¶30 However, when valuing subsidized housing, the WPAM suggests that the "Cost Approach is the least reliable valuation method" because of "the difficulty in estimating external obsolescence." 1 Wisconsin Property Assessment Manual at 9-45. Accordingly, an assessor should apply the cost approach when

evaluating subsidized housing only when other approaches are not available.[12]

¶31 Because an appraiser must consider all aspects of the subject property that may affect its value, appraisers must consider whether a property's value is affected by its classification as residential property subject to Section 42 subsidized housing restrictions. See Metro. Holding, 173 Wis. 2d at 631-32.

¶32 The income approach is often the most reliable method for assessing subsidized housing. 1 Wisconsin Property Assessment Manual at 9-45 ("The income approach may be the most useful method for valuing subsidized housing . . . ."). The income approach is superior when applied to subsidized housing "due to the conditions of the agreement and the limited availability of data." Id.

¶33 The WPAM recognizes dissimilarities between subsidized properties and market-rate properties. It instructs that federally regulated properties are to be treated "as a separate market and distinct from conventional (market level) projects." 1 Wisconsin Property Assessment Manual at 9-42. Specifically, federally regulated properties have "operational constraints

---

[12] Wisconsin Stat. § 70.32(1g) prohibits assessors from considering the effect of Section 42 tax credits when valuing property. It is nearly impossible to apply the "cost approach" to subsidized housing because the "cost approach" requires an appraiser to examine the cost of replacing the property, which will necessarily be impacted by the tax credits an owner receives in return for constructing the property.

(regulations) and risk factors that are different from a market rate property." Id. As such, appraisals that fail to account for differences between those properties and market-rate properties contravene the WPAM and Wis. Stat. § 70.32. Metro. Holding, 173 Wis. 2d at 630-32.

¶34 The WPAM provides that to be "reasonably comparable," other properties must have "similar restrictions" to the subject property. 1 Wisconsin Property Assessment Manual at 9-45 ("To be considered [reasonably] comparable, the recent arm's-length sales should have restrictions similar to the subject property."). With these foundational principles in mind, we turn to the 2012 and 2013 appraisals that underlie the tax assessments for Regency West's property.

## C. Regency West's Property

### 1. 2012 tax assessment

¶35 Regency West placed its first units in service September of 2011, and the project was fully leased in February of 2012. Both Racine and Regency West valued the subject property as of January 1, 2012, using the income approach. However, they did not apply it in the same way. First, Racine did not do an individualized appraisal of Regency West's property, but instead, employed "mass appraisal techniques" because its appraisers had 7,500 properties to value in 2012. Regency West's appraisal was based on the subject property. Second, Racine did not consider the projected expenses and income for the subject property when calculating its NOI. Regency West used projected expenses and income for the subject

14

property. Third, Racine employed a capitalization rate based on market-rate properties; Regency West applied a capitalization rate derived from a Section 42 housing market.

¶36 In calculating Regency West's NOI for 2012 under its mass appraisal technique, the City's appraiser used market-rate vacancy and market-rate expenses instead of the vacancy and expense projections that were specific to the subject property. This approach fails to account for the vast differences in federally regulated housing discussed above and distorts the actual value of Regency West's property.

¶37 An appraiser must not value federally regulated housing as if it were market-rate property. Doing so causes the assessor to "pretend" that the subject property is not hindered by federal restrictions. Metro. Holding, 173 Wis. 2d at 631; see also 1 Wisconsin Property Assessment Manual at 9-45 ("Any income approach used must consider all the impacts of the subsidy program."). The restrictions and underlying agreements implicit in federally regulated housing will affect the property's value. See Bloomer Hous. Ltd. P'ship v. City of Bloomer, 2002 WI App 252, ¶31, 257 Wis. 2d 883, 653 N.W.2d 309 ("An assessor must consider the effects of the restrictions on subsidized housing."); Walworth Affordable Hous., LLC v. Vill. of Walworth, 229 Wis. 2d 797, 802-03, 601 N.W.2d 325 (Ct. App. 1999) (reasoning that because the subject "property is encumbered with income and rental restrictions resulting from the [Federal Housing Tax Credits], these restrictions must be considered in the property's valuation."). As discussed above,

15

the WPAM recognizes these differences and directs that assessors are not to treat federally regulated housing as if it were market-rate housing for purposes of determining property values. 1 Wisconsin Property Assessment Manual at 9-42 ("Subsidized housing properties operate differently than conventional (market-rate) properties.").

¶38 Our decision in Metropolitan Holding unambiguously requires assessors to use income and expenses for the subject property when valuing subsidized housing under the income approach. Metro. Holding, 173 Wis. 2d at 634 (remanding the "case with instructions that [t]he Board order the city assessor to assess Layton Garden using the capitalization of income approach based on actual income and expenses").

¶39 In Metropolitan Holding, the plaintiff, Layton Garden, argued that its property was valued artificially high because the City of Milwaukee had relied on market-rate expenses when determining the property's NOI. Id. at 630. We agreed with Layton Garden and overturned the City of Milwaukee's tax assessment based on that valuation. Id. We reasoned that by employing market-rate rents and market-rate expenses, the city assessor "pretended that Layton Garden was not hindered by the HUD restrictions and valued the property at the amount the property would bring in an arm's-length transaction if Metropolitan were able to charge market rents." Id. at 631; see also Mineral Point Valley Ltd. P'ship v. City of Mineral Point Bd. of Review, 2004 WI App 158, ¶11, 275 Wis. 2d 784, 686 N.W.2d 697 (concluding that the assessor must value properties

16

individually, not based on hypothetical income and expenses (citing Metro. Holding, 173 Wis. 2d at 629)).

¶40 Wisconsin Stat. § 70.32(1) requires assessors to value property based on "the best information that the assessor can practicably obtain." Here, there was available to Racine's assessor projected expenses and income for this newly opened property. However, Racine chose not employ that information and chose instead to calculate the NOI for its income-based valuation through mass appraisal techniques that were not particularized to Regency West's property. We conclude that in that regard, Racine did not comply with the directive of § 70.32(1) because it did not use the "best information" that was available to its assessor.

¶41 In contrast to the City's approach, Regency West used income and expenses specifically projected for the subject property when it calculated the NOI for its income-based valuation. These projected expenses are the best information that could practicably be obtained. We conclude that for this newly opened property, the use of projected expenses complies with the mandate of Wis. Stat. § 70.32(1).

¶42 In addition to calculating a NOI for the subject property, an income-based valuation requires determining the applicable capitalization rate. Therefore, we consider whether appraisers, when valuing federally regulated properties, may derive the capitalization rate from market-rate properties. We conclude that they may not.

17

¶43 The capitalization rate expresses the rate of return an investor would expect to receive from an investment in the subject property. 1 <u>Wisconsin Property Assessment Manual</u> at 9-21. The determination of the applicable capitalization rate is a critical element in determining the value of a property because a small change in capitalization rate will create a significant change in a property's value. This is so because the value of a subject property is determined by dividing its NOI by the applicable capitalization rate, which rate is expressed as a percentage. <u>Id.</u> Therefore, a larger percentage will yield a smaller total value for the property.

¶44 When determining the applicable capitalization rate, assessors must consider factors that appreciably alter the value of the property. Otherwise, the capitalization rate will not truly represent the risk an investor is undertaking when investing in the property.

¶45 "Capitalization rates from the marketplace are usually derived from the sale of market-rate projects." <u>Id.</u> at 9-45. Such capitalization rates "do not reflect the unique characteristics of subsidized housing. In some cases there can be more risk in subsidized housing, in other cases there is less." <u>Id.</u> The WPAM further explains, "Rent levels are often regulated and annual increases may be difficult to obtain. In many cases the proportion of debt to equity is different in subsidized projects than in market rate projects. With some types of projects the amount of annual equity return is limited (called a limited dividend)." <u>Id.</u> Additionally, for some types

of federally regulated housing, "equity investors primarily look to other sources beyond the cash flow of the property for their required return on investment." Id.

¶46 Appraisers who fail to consider property classified as federally regulated housing and the restrictions attendant thereto when deriving capitalization rates are overlooking major characteristics of such property. After all, a property's classification as federally regulated housing may substantially impact the risks associated with the property, thereby altering the market for the property.

¶47 Moreover, as discussed above, the WPAM prohibits appraisers from using market-rate properties when valuing federally regulated housing. As a corollary, appraisers may not derive a capitalization rate from market-rate properties. Rather, appraisers should use "recent market value sales of similar properties" to determine the capitalization rate. Id. at 9-24. Therefore, when valuing a property using the income approach, appraisers must use capitalization rates derived from a market consistent with the market for the subject property. [13]

---

[13] The market of properties an appraiser may consider when determining the capitalization rate will often be broader than the market of properties that are reasonably comparable to the subject property. The WPAM does not require an appraiser to consider the specific restrictions attendant to each property an appraiser relies on to determine the capitalization rate; the property manual requires that the properties the appraiser relies on be "similar." See 1 Wisconsin Property Manual at 9-24 (stating that an appraiser must use "similar properties" when determining the capitalization rate). Therefore, the capitalization rate may be derived from properties classified as the same type of federal housing as the subject property without

(continued)

¶48 The City assessor used 6 percent as a base capitalization rate, which she derived through mass appraisal techniques of market-rate properties.  The assessor then added 2.5 percent, which is the tax rate for Regency West, yielding a loaded capitalization rate of 8.5 percent.[14]

¶49 Both the circuit court and the court of appeals approved the 6 percent base rate.  They relied on Mineral Point Valley from which they concluded that the applicable capitalization rate must be derived from market-rate properties.[15]  The court of appeals also relied on Bischoff v. City of Appleton, 81 Wis. 2d 612, 260 N.W.2d 773 (1978).  Their reliance on either Mineral Point Valley or Bischoff is misplaced, and it also fails to comply with our decision in Metropolitan Holdings discussed in some detail above.

---

considering the property's individualized restrictions.  In contrast, whether properties are reasonably comparable for purposes of the comparative sales approach to valuation requires a more exacting analysis.  Properties used for valuation under the comparable sales approach must have "restrictions similar to the subject property."  Id. at 9-45 (emphasis added).

[14] Both parties added the City of Racine's tax rate to the base capitalization rate they calculated, as the addition is required by WPAM.  1 Wisconsin Property Assessment Manual at 9-22.

[15] The circuit court also approved Racine's appraisal for the 2012 income valuation, saying it was ok for "commercial Property."  However, under Wis. Stat. § 70.32(2)(a)1., Regency West is classified as residential property, not commercial property, which is set out under Wis. Stat. § 70.32(2)(a)2.

20

¶50  Mineral Point Valley considered competing arguments about which interest rate should be used when establishing a capitalization rate based on the underlying mortgage for a HUD § 515 property.[16]  Mineral Point Valley, 275 Wis. 2d 784, ¶8. The partnership had obtained a 50-year mortgage at 8.75 percent. Id. at ¶3.  As part of the HUD program, the federal government subsidized the partnership for 7.75 percent of that interest. Id.  Because of the subsidy, the city assessor used 1 percent as the capitalization rate and the partnership used 8.75 percent. The court of appeals precluded the use of 1 percent as the capitalization rate.  Id., ¶13.

¶51  Mineral Point Valley did not involve a direct capitalization of income approach, which is the type of capitalization approach all parties have used in the case before us for 2012.  Mineral Point Valley had nothing to do with whether market-rate properties or Section 42 properties should establish the market from which sales and NOIs were obtained when determining the applicable capitalization rate for federally regulated housing.[17]  Therefore, Mineral Point Valley should not be read to have concluded that an appraiser may calculate a capitalization rate from market-rate properties when valuing federally regulated property.

---

[16] See 42 U.S.C. § 1485.

[17] Recall that a market-driven capitalization rate is determined by taking NOIs of comparable properties and dividing those numbers by the sale prices for those properties.

¶52 In the case at hand, the City's assessors used a capitalization rate derived from market-rate properties when appraising Regency West's federally regulated property for 2012. The City's assessors should have used a market for Section 42 properties to determine the capitalization rate. See Metro. Holding, 173 Wis. 2d at 634. Instead, the assessors used a capitalization rate provided by a brokerage firm, which did not account for the property's classification as subsidized housing. As a result, the City's assessors' use of a 6 percent base capitalization rate was not in compliance with Wis. Stat. § 70.32(1) or with the WPAM. Taxing authorities are required to comply with the law when valuing properties, and failing to do so negates the presumption of correctness that Wis. Stat. § 70.49 otherwise accords. Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶12, 317 Wis. 2d 228, 767 N.W.2d 567 (citing Walgreen, 311 Wis. 2d 158, ¶17).

¶53 The court of appeals, relying on our decision in Bischoff concluded that an appraiser's sole reliance on an income approach to valuation was improper. The court of appeals' reliance on Bischoff is understandable, but misplaced.[18]

---

[18] The court of appeals' rationale that Section 42 and Section 8 programs are similar because they are found within the same section of the WPAM is unconvincing. Both are subsidized housing; however, the similarities between the two programs largely end there. The two programs have vastly different restrictions.

¶54 <u>Bischoff</u> arose in the context of demurrer where we held that a complaint that alleged error in the use of the income approach for valuation when there had been an arm's-length sale was timely filed. <u>Bischoff</u>, 81 Wis. 2d at 619-20. We never concluded that an income approach could not be used as the sole method of valuation in all cases. <u>See also</u> <u>Northland Whitehall Apts. Ltd. P'ship v. City of Whitehall Bd. of Review</u>, 2006 WI App 60, ¶25, 290 Wis. 2d 488, 713 N.W.2d 646 ("the 'income approach' as utilized by its appraiser has also been recognized by the courts . . . as a valid method of determining the value of subsidized housing projects").

¶55 Furthermore, <u>Bischoff</u> did not address subsidized housing. As we have explained, because of the difficulty in appraising subsidized properties under other appraisal methods, the income approach may be the best determiner of value. And, the WPAM does not preclude appraisers from relying solely on the income approach when valuing subsidized properties. We have recognized that a single valuation approach under the third tier may be appropriate. <u>Adams</u>, 294 Wis. 2d 441, ¶53 ("There may be situations in which the only information available compels an assessor to use a single methodology to [value] property.").

¶56 By contrast, Regency West's expert utilized a market for Section 42 properties when constructing the applicable capitalization rate. In that market, Section 42 property base capitalization rates averaged 7.4 percent for senior properties (with a high of 8.4 percent and a low of 5.9 percent) and averaged 7.57 percent for family property (with a high of 8.83

23

percent and a low of 6.59 percent).  Regency West's expert used a base capitalization of 8 percent for 2012.  He then added the same tax rate of 2.54 percent, and employed a loaded rate of 10.54 percent in his income-based 2012 valuation.  Determining the capitalization rate in this manner complied with the WPAM as Wis. Stat. § 70.32(1) requires.

¶57 Based on its expert's calculations described above, Regency West valued its property at $2,700,000 as of January 1, 2012.  Racine's valuation of $4,425,000 was derived from a procedure that did not comply with Wis. Stat. § 70.32(1) and the WPAM; Regency West's valuation followed the requirements of § 70.32(1) and WPAM in its valuation.  Regency West's appraisal is the best evidence of the property's value.[19]  Accordingly, we conclude that Regency West has shouldered its burden to show that Racine's taxation for 2012 was excessive and a refund is due.

### 2.  2013 tax assessment

¶58 Although both parties employed the income approach to valuation for 2012, only Regency West did so for 2013.  Racine applied a comparative sales approach for its 2013 assessment.

---

[19] We do not consider the appraisals of Peter Weissenfluh and Dan Furdek because their appraisals exceeded the valuations of Racine for both 2012 and 2013.  See Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶¶12-13, 315 Wis. 2d 791, 762 N.W.2d 841 (concluding that a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek; Wis. Stat. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments).

Regency West argues that the properties the City's appraiser relied on, primarily Section 8 properties, were not reasonably comparable to the subject property, which is Section 42 housing. For the reasons discussed below, we conclude that Section 8 and Section 42 properties are not "reasonably comparable," and therefore the City incorrectly applied the comparative sales approach when valuing Regency West's property for 2013.

¶59 It is the legislature that required the use of "recent arm's-length sales of reasonably comparable property" when an appraiser is valuing a property under the second tier method. Wis. Stat. § 70.32(1). And in addition, § 70.32(1) also requires consideration of "all factors that, according to professionally acceptable appraisal practices, affect the value of the property."

¶60 If there are no "reasonably comparable" properties, the comparable sales approach cannot be used. Allright Props., 317 Wis. 2d 228, ¶29. That is, an appraiser cannot accurately value a property using data from the sales of properties that are not "reasonably comparable" to the subject property. Absent comparable sales, an appraiser must apply the third tier for valuing property. Id.

¶61 The WPAM does not leave the determination of whether properties are reasonably comparable wholly to the discretion of an appraiser. It provides appraisers with instructions for assessing subsidized properties under the comparable sales approach. To obtain the necessary information, an appraiser "may have to perform a statewide search to find comparable

sales." 1 <u>Wisconsin Property Assessment Manual</u> at 9-45. An appraiser can obtain this information "by viewing website data and by calling other assessors who have similar subsidized housing in their jurisdictions." <u>Id.</u>

¶62 The WPAM explicitly states when subsidized properties are reasonably comparable: properties being compared must have "restrictions similar to the subject property." <u>Id.</u> To determine if properties have similar restrictions, an appraiser must examine the specific restrictions that apply to each property, as well as the differences between these restrictions. And, an appraiser must consider the nature of these restrictions and the ways in which these restrictions affect the value of each property. This also suggests that an appraiser should not compare subsidized property to non-subsidized property as non-subsidized property lacks the restrictions subsidized property carries. We have explained the necessity of understanding the specific restrictions appurtenant to federally regulated property when appraising such property. <u>Metro. Holding</u>, 173 Wis. 2d at 631-32. The failure of an appraiser to consider the restrictions specific to the subject property is a failure to follow Wisconsin law. We now examine whether two specific classifications of subsidized housing, Section 8 and Section 42, are "reasonably comparable."[20]

---

[20] The WPAM has a section dedicated to the various subsidized housing credits. 1 <u>Wisconsin Property Assessment Manual</u> at 9-40. This section includes descriptions of the two types of federally regulated properties at issue in this case, Section 42 and Section 8.

¶63  Section 42 is a United States Treasury program that promotes the development of affordable housing by allowing an owner to receive federal tax credits for developing a parcel of land into Section 42 housing.[21]  The credits can be exchanged for equity in the property, which allows the owner to reduce construction debt with equity financing.  Under the Section 42 program, investors receive "a dollar-for-dollar reduction in federal tax liability . . . in exchange for equity participation in low-income rental housing."  1 Wisconsin Property Assessment Manual at 9-40.

¶64  Section 42 "credits come with many restrictions."  Id. For example, in Wisconsin the owner is required to enter into a LURA that obligates the owner to maintain the project for 30 years with rent-restricted units for income-qualified tenants. Id.

¶65  In contrast, Section 8 is a rent subsidy program. "Project owners receive a rental subsidy payment under Housing Assistance Payment Contract (HAP Contract) that range from 15 to 40 years."  Id. at 9-42.  The property owner is required to rent Section 8 units to tenants from low or very low-income families. "Families whose incomes do not exceed 80% of the median income in the area are defined as low-income; very low-income families do not exceed 50% of the median income."  Id.

---

[21] In Wisconsin, Section 42 housing is administered by WHEDA.

¶66 Section 8 properties are generally a low risk investment. The risk is low, in part, because the federal government insures the owners of Section 8 housing against the possibility that their tenants will fail to pay rent.

¶67 In sum, Section 42 and Section 8 are vastly different subsidized housing programs, with different risks for the owners. Section 42 is a tax credit program; Section 8 is a subsidy program. Section 42 is a riskier investment because the government does not insure against non-payment of rents. In contrast, the government guarantees much of the rents of Section 8 properties. Unlike owners of Section 8 properties, Section 42 owners are required to enter into a 30-year LURA. Regency West's expert testified that these differences lead to vastly different markets for the two types of properties.

¶68 In the case before us, the City's assessors relied on the sales of three properties: Lake Oakes, Woodside Village/Albert House and McMynn Tower. Lake Oakes possesses few Section 42 housing units; most units are market-rate rentals. Woodside Village/Albert House and McMynn Tower have no Section 42 units. One property was entirely Section 8 housing and the other was Section 8 housing with a few commercial units. Therefore, their sales were not representative of "reasonably comparable" arm's-length sales as the second tier of Wis. Stat. § 70.32(1) and the WPAM require.

¶69 Moreover, the City's assessors did not consider the varying restrictions federal regulations require when valuing Regency West's property. Rather, Scites testified that Section

28

42 and Section 8 properties have similar restrictions. Scites relied almost entirely on the properties' similar rates of rent, without recognizing that Section 8 rents are subsidized by the government and Section 42 rents are not. Furthermore, nothing in the WPAM or Wisconsin law equates "reasonably comparable" with "similar rents." The failure of Racine to consider the properties' restrictions caused the three sales Scites relied on to fall outside the parameters of reasonably comparable sales.

¶70 The City was required to consider the various restrictions on subsidized properties. And, as a matter of law, Section 8 and Section 42 do not possess the same restrictions. The City's 2013 assessment of the subject property relied totally on its assertion that the sales of Lake Oakes, Woodside Village/Albert House and McMynn Tower were sales of reasonably comparable properties. As we have explained above, WPAM explains the differences those properties have from Regency West's property such that they are not reasonably comparable. Accordingly, Scites' 2013 appraisal was completed in violation of Wisconsin law and the WPAM. The circuit court erroneously concluded that the City's assessors complied with Wisconsin law.[22]

¶71 We conclude that Scites' 2013 appraisal failed to follow Wisconsin law and the WPAM, negating the presumption of

---

[22] We emphasize that whether an assessor complied with Wisconsin law and the WPAM are questions of law for our independent review. Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶26, 294 Wis. 2d 441, 717 N.W.2d 803.

correctness otherwise available in Wis. Stat. § 70.49. <u>Allright Props.</u>, 317 Wis. 2d 228, ¶12.

¶72 Regency West argues that it has presented the only evidence of its property's value as of January 1, 2013 that complies with Wisconsin law and the WPAM. We agree. It did so in its third tier direct capitalization of income appraisal. That appraisal employed actual expenses and income for the property upon which the NOI was calculated, and it derived its capitalization rate from a market for Section 42 properties. Regency West's appraisal determined that the property's value was $2,730,000 as of January 1, 2013. This is sufficient evidence to meet Regency West's burden to show that the City's tax assessment was excessive and accordingly a refund is due.[23]

### III. CONCLUSION

¶73 We conclude that the valuation methodologies Racine used for the 2012 and 2013 assessments did not comply with Wisconsin law. Accordingly, we also conclude that Regency West has overcome the presumption of correctness for the 2012 and 2013 tax assessments, and that the circuit court and the court of appeals erred in concluding otherwise. And, finally, we conclude that Regency West has proved that Racine's tax assessments for 2012 and 2013 were excessive. Accordingly, we

---

[23] Regency West had the burden to show that that assessment was excessive. <u>See</u> <u>Sausen v. Town of Black Creek Bd. of Review</u>, 2014 WI 9, ¶20, 352 Wis. 2d 576, 843 N.W.2d 39.

reverse and remand to the circuit court to determine the amount of the refund due Regency West.

*By the Court.*—The decision of the court of appeals is reversed and remanded.

¶74 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Fortunately for Regency West (and unfortunately for Racine's coffers and the other Racine taxpayers), the majority opinion declares that the lower assessment of the property at issue is correct. The majority opinion flouts the longstanding principle that property tax assessors should use the best information possible in order to determine real property's full value, upends the proper scope of appellate review, and inserts itself as a fact-finder. Because of the majority opinion's unwarranted departures from precedent and usurpation of the role of the circuit court, I dissent.

¶75 The essential question posed in this court is whether Racine's original assessments are excessive. The circuit court, the court of appeals, and I answer the question in the negative. Applying a correct legal analysis, giving deference to the circuit court, the fact-finder, and reviewing the record compel answering the question with a firm, clear "No."

¶76 The majority opinion reaches the opposite answer, resting its conclusion on errors of law and on its refusal to consider the evidence Racine presented. Now, assessors of federally subsidized housing (at least Section 42 housing) apparently can go straight to an income approach, a third-tier method of assessment, bypassing the best information and other proper assessment methodologies along the way.

I

¶77 Regency West, the property at issue, comprises 72 apartment units and is owned by a limited liability corporation.

1

The property is treated as commercial property for assessment purposes. Wisconsin Property Assessment Manual 9-1 (2011) [hereinafter Manual] ("For assessment purposes commercial property consists of . . . [a]partment houses of four or more units . . . ."). Although the majority opinion describes Regency West as residential property, the majority opinion applies the commercial valuation principles set forth in the Manual.[1]

¶78 I agree with the majority opinion that general appraisal principles apply to federally subsidized housing. I agree with the majority opinion that the three valuation approaches are an arm's-length sale of the subject property (tier one), the sales comparison approach (tier two), and income, cost, and other valuation methods (tier three).[2]

¶79 I agree with the majority opinion that the statutory interpretation and application of Wis. Stat. § 70.32 presents a question of law that this court determines independently. The court determines, as a matter of law, whether the assessor's valuation methodology complies with statutory requirements. Here our agreement ends.

¶80 I disagree with the majority opinion that, as a matter of law, the only valuation approach applicable in the instant

---

[1] See majority op., ¶¶24, 31, 50 n.15.

[2] All parties agree that there are no recent arm's-length sales of Regency West, so a tier one analysis was not possible. The instant case is about which other tier analyses should be used.

2

case is the income approach. The majority opinion errs as a matter of law.

¶81 The majority opinion errs as a matter of law when it totally discards and disregards in its analysis the evidence presented by Dan Furdek and Peter Weissenfluh, Racine's expert witnesses. The majority opinion describes Furdek and Weissenfluh's evidence, but does not consider the evidence in its analysis and conclusion.

¶82 Why ignore these experts? One reason is "because," according to the majority opinion, "their appraisals exceeded the valuations of Racine for both 2012 and 2013." Majority op., ¶57 n.20.[3] A second reason for ignoring Racine's two experts, according to the majority opinion, is that they err as a matter of law in using a sale comparison approach to valuation in the instant case.

¶83 The majority opinion supports its legal conclusion that Racine's two experts should be ignored in their entirety in footnote 19, citing Trailwood Ventures, LLC v. Village of Kronenwetter, 2009 WI App 18, ¶¶12-13, 315 Wis. 2d 791, 762 N.W.2d 841. The footnote in the majority opinion states:

> We do not consider the appraisals of Peter Weissenfluh
> and Dan Furdek because their appraisals exceeded the
> valuations of Racine for both 2012 and 2013. See
> Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009

___

[3] The majority misstates Furdek and Weissenfluh's report because the experts' pre-reconciliation value derived from the income approach was actually lower than the original assessments. After reconciling their various approaches, however, their appraisal was slightly higher than the original assessments.

3

WI App 18, ¶¶12-13, 315 Wis. 2d 791, 762 N.W.2d 841 (concluding that a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek; Wis. Stat. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments).

¶84 The Trailwood Ventures case does not support the conclusion of law (reached by the majority opinion) that a court cannot or should not consider evidence presented that the value of the subject property was greater than the assessment from which review was sought. The Trailwood Ventures decision says nothing about admissible evidence or disregarding evidence that the value of the subject property was greater than the original assessment. The briefs filed in Trailwood Ventures, as well as the opinion, make clear that admissibility of evidence was not an issue in Trailwood Ventures.

¶85 Trailwood Ventures holds only that the statutes do not permit a trial court to set a higher assessment under Wis. Stat. § 74.37 than that from which the taxpayer appealed or impose a greater tax burden on the taxpayer than the one the taxpayer challenges. Trailwood Ventures, 315 Wis. 2d 791, ¶¶10, 12-14.

¶86 Trailwood Ventures offers no guidance in the instant case. Racine's purpose of introducing its experts' evidence was not to increase Regency West's assessments for 2012 and 2013 or to levy a larger tax on Regency West for those years. Furdek and Weissenfluh's evidence was to serve the singular purpose of showing that Racine's initial assessments were not excessive. In misapplying Trailwood Ventures, the majority opinion commits

a fatal error of law by utterly ignoring the evidence presented by Racine's two expert witnesses.

¶87 The majority opinion is off on its own solo venture in discussing Trailwood Ventures. Regency West has made no objection to the admission of Furdek and Weissenfluh's testimony on the ground that their valuation was higher than Racine's initial estimate. Neither party's briefs in the instant case cite or discuss Trailwood Ventures. The majority opinion misinterprets and misapplies Trailwood Ventures to make new law in the instant case.

¶88 A second reason the majority opinion errs as a matter of law in deciding that only the income method of valuation applies and in discarding the evidence of Weissenfluh and Furdek is that the majority opinion concludes that the sales comparison approach was not a valid appraisal method in the instant case. The majority opinion takes a cribbed, too narrow view of the sales comparison approach. (Weissenfluh and Furdek also used an income approach.)

¶89 The majority opinion misreads the directive in the Manual that "the recent arm's-length sales [of federally subsidized housing] should have restrictions similar to the subject property." Manual at 9-52 (emphasis added). The majority opinion reads "similar" to mean "identical" and concludes that Racine's two experts' comparable sales approach was erroneous.

¶90 The second tier method of valuation, the sales comparison approach, requires an assessor to use the value of

"reasonably comparable" properties. "'[R]easonable comparability' depends upon the degree of similarity between the properties in question." <u>Rosen v. City of Milwaukee</u>, 72 Wis. 2d 653, 686, 242 N.W.2d 681 (1976). The court has suggested some factors to consider in determining the similarity of properties:

> Important considerations in determining whether particular property is sufficiently similar to the property being assessed to warrant reliance on its sale price as evidence of market value include its location, including the distance from the assessed property, its business or residential advantages or disadvantages, its improvements, size and use. It is also important to consider the conditions of sale, including its time in relation to the date of valuation, and its general mode and character insofar as they tend to indicate an arm's-length transaction.

<u>Rosen</u>, 72 Wis. 2d at 665.

¶91 The Manual at 9-12 provides that the "sales comparison approach should be used" if there are comparable properties, and that "[t]o be comparable, properties should be similar in both physical and economic characteristics including . . . the ability to generate income . . . ."

¶92 The Manual contains a section devoted to subsidized housing, including Section 42 housing.[4] The Manual describes 10 different types of federally subsidized housing. Regarding Section 42 housing, the Manual notes that these projects' operating income is often lower than market rate properties and that these projects can be risky because of tenant income

---

[4] <u>Manual</u> at 9-44 to 9-54.

6

restrictions.[5]  The Manual addresses generally how to assess the 10 different federally subsidized projects.  Case law and the Manual make clear that assessors must consider the impact that the subsidized housing's restrictions have on value.

¶93 Nothing in the Manual's subsection addressing federally subsidized Section 42 housing discusses any limitations on the type of assessment methodology that should be used in assessing these properties.  The Manual does not foreclose using sales comparison to value subsidized housing, although the majority opinion reads the Manual as if it does.  Indeed, the Manual refers to using the sales comparison approach in determining the proper method of valuation for federally subsidized housing.  See Manual at 9-52.  The Manual does state that "the income approach may be the most useful method for valuing subsidized housing . . . ."  See Manual at 9-53.  The operative word is "may."

¶94 As to using the sales comparison approach, the Manual explains that a comparable property should have restrictions similar to the subject property and information should be sought from several sources.  The Manual states:

> To be considered comparable, the recent arm's-length sales should have restrictions similar to the subject property.  The assessor may have to perform a statewide search to find comparable sales.  Sales data should always be confirmed by reliable sources. Information may be obtained by viewing website data

---

[5] Manual at 9-47.  In both Racine and Milwaukee (the location of the comparables used by Racine's experts), Section 42 properties usually have a waiting list.

and by calling other assessors who have similar subsidized housing in their jurisdictions.

Manual at 9-52.

¶95 The evidence presented by Furdek and Weissenfluh adheres to the Manual. They considered the impact of the Section 42 restrictions in their sales comparison valuation. I will comment further on their evidence later on. For now, I just point out that the majority opinion errs in disregarding out of hand the sales comparison approach in the instant case.

¶96 In sum, the majority opinion is based on errors of law regarding the interpretation and application of the three tiers of valuation and in entirely disregarding Furdek and Weissenfluh's evidence. The majority opinion relies only on Racine's assessor, Janet Scites, and Racine's Chief Assessor, Ray Anderson.

¶97 I turn to the standard of review of the evidence in the record. I then analyze the testimony of the competing experts and review the circuit court's findings of fact and determination under the proper standard of review.

II

¶98 Having determined that Racine's experts complied with the statute and the Manual in using several methods of valuation, I now determine whether Racine's original assessments were excessive. A challenger, here Regency West, has the burden at trial to "produce evidence that it is more probable than not that the assessed value is not correct." Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶9, 351 Wis. 2d 439,

839 N.W.2d 893. Racine may rebut with its own evidence Regency West's production of evidence.

¶99 The circuit court's findings of fact will not be overturned by an appellate court unless they are clearly erroneous, that is, unless they are against the great weight of the evidence. Findings of fact are not against the great weight of the evidence "merely because a different fact-finder could draw different inferences from the record." State v. Wenk, 2001 WI App 268, ¶8, 248 Wis. 2d 714, 637 N.W.2d 417.

¶100 Further, the weight and credibility that an appellate court gives to the evidence of an expert witness is also "uniquely within the province of the fact finder." Bloomer Housing Ltd. P'ship v. City of Bloomer, 2002 WI App 252, ¶12, 257 Wis. 2d 883, 653 N.W.2d 309 (quoted source omitted). "Where, as here, there is conflicting testimony, the fact finder is the ultimate arbiter of credibility and when more than one reasonable inference can be drawn, the reviewing court must accept the inference drawn by the trier of fact." Bloomer, 257 Wis. 2d 883, ¶12 (internal quotation marks omitted); see also Mineral Point Valley Ltd. P'ship v. City of Mineral Point Bd. of Review, 2004 WI App 158, ¶16, 275 Wis. 2d 784, 686 N.W.2d 697 (Deininger, P.J., concurring) ("I recognize that, in the absence of a recent arms-length sale, property valuation depends largely on matters of judgment and expertise. . . . [A]ppraised values of a particular property can differ sharply, and [ ] it is most often the fact finder's proper role to assess the weight and credibility of competing opinions of fair market value.").

III

¶101 Following a four-day bench trial filled with extensive expert evidence from both sides, the Circuit Court for Racine County concluded that the original assessments were not excessive.

¶102 The crux of the circuit court's decision involved determining the weight and credibility of conflicting expert evidence. Each side presented experts and, as the circuit court explained, "[t]he opinions provided by all experts in this case [were] highly subjective. All experts stabilized values, loaded cap rates, or made adjustments to factors used in calculating their valuations based on their experience and for reasons stated in their testimony."

¶103 Ultimately, the circuit court concluded (and the court of appeals agreed) that Racine's experts were more credible and more persuasive. Based on this determination, the circuit court concluded that Racine's original assessments were not excessive. The court of appeals affirmed.

¶104 Deferring to the circuit court's findings of fact about the credibility of the expert witnesses and the weight to be given to each of them, I agree with the circuit court's conclusion that Regency West failed to carry its burden. The circuit court was not persuaded that Regency West established that it was more probable than not that the assessed values were excessive. The evidence supports the circuit court's conclusion.

¶105 Racine's experts, Furdek and Weissenfluh, are well-versed in Wisconsin appraisal techniques as well as appraisal techniques for subsidized housing. Each has spent the majority of his career in the Milwaukee Assessor's Office; they have recently gone into private practice together. Contrary to the majority opinion's assertion, both Furdek and Weissenfluh have experience with Section 42 subsidized housing. In their respective tenures at the Milwaukee Assessor's office, they were directly involved with assessing Milwaukee's numerous Section 42 properties or reviewing and signing off on the assessments of Section 42 properties. Each has given presentations on valuing subsidized housing.

¶106 These experts submitted a thorough, nearly 70-page assessment report using several different valuation methodologies. They testified at length, concluding that Racine's initial assessments of Regency West were not excessive.

¶107 Furdek and Weissenfluh considered three traditional valuation approaches: sales comparison (tier two), income (tier three), and cost (tier three). The Manual at 9-52 states, referring to Wis. Stat. § 70.32, that "[t]he assessor should consider all three approaches to value when assessing federally subsidized properties." Indeed, all three approaches are set forth in the Manual at 9-52 to 9-54, discussing federally subsidized housing.

¶108 Before applying these assessment methodologies, Furdek and Weissenfluh explained Wisconsin assessment standards applying to subsidized housing, thoroughly examined Racine's

real estate climate, and stated the assumptions upon which they based their analyses. This extensive pre-assessment analysis complies with the Manual, which provides:

> Each type of property presents unique valuation problems. This requires the assessor to possess a great deal of knowledge about the current economic conditions of the area and any trends and factors that may influence the value of commercial property.
>
> . . . .
>
> Given the data used and the type of property appraised, the appraiser must consider how well each method employed estimates the value of the property. . . .
>
> How does the appraiser determine which approach or approaches are most reliable? The best guidance that can be offered is to review the market activity for the subject and determine the attributes by which the market uses to evaluate alternative real estate decisions.

Manual at 9-1, 9-39.

¶109 Furdek and Weissenfluh also met with the Wisconsin Housing and Economic Development Authority (WHEDA) to discuss Section 42 and Section 8 federally subsidized housing. In Wisconsin, WHEDA administers Section 42 tax credits and publishes the maximum rents that may be charged to Section 42 tenants. Manual at 9-46. The WHEDA representative stated that Section 8 and Section 42 properties were economically comparable.

¶110 Based upon their conversation with WHEDA, Furdek and Weissenfluh concluded that most Land Use Restriction Agreements (LURAs) for Section 42 properties impose similar restrictions.

They therefore used a sales comparison approach using other Section 42 properties.

¶111 Furdek and Weissenfluh primarily relied on a sales comparison approach that consisted of three properties. Their Report explains that the "sales [were] researched through numerous sources, inspected and verified by a party to the transaction." Two of the properties comprised a mix of Section 42 units and market units. The other comparable property consisted of a building that was being converted into Section 42 housing.

¶112 Because the comparables Furdek and Weissenfluh found were not identical to Regency West, these experts complied with the Manual——they made adjustments in their comparisons. They explained that they took into account specific differences between the comparables and Regency West, including the location, age, and non-section 42 portions, to arrive at a value for Regency West. Only after making these adjustments did Furdek and Weissenfluh use the sales comparison approach to arrive at the value of the Regency West property. This valuation corroborated the original assessments.

¶113 Furdek and Weissenfluh also used two income approaches, a capitalization of income approach and a discounted cash flow analysis, and a cost approach. For each of these approaches, these experts used a combination of Regency West's actual expenses as well as projected expenses. The experts reconciled the values derived from each approach to reach a valuation.

¶114 Each of these valuation methodologies, independently and when reconciled with the others, confirmed that Janet Scites——Racine's assessor whose initial assessments Regency West challenged——got it right.

¶115 In stark contrast to the extensive, multi-faceted evidence presented by Racine's experts, Regency West presented one expert, Scott McLaughlin. Although McLaughlin claimed that he specialized in assessing federally subsidized housing, the record does not reflect the extent of his Wisconsin-specific assessment experience. That said, the majority opinion relies extensively (indeed exclusively) on McLaughlin's testimony and report.

¶116 In the instant case, McLaughlin prepared a four-page report consisting only of a capitalization of income approach to valuation. This report was based on Regency West's projected expenses for 2012 and actual expenses for 2013. McLaughlin's report did not state his assumptions, nor did it consider market conditions affecting the value of property in Racine. Furthermore, McLaughlin's report does not explain the basis for his opinions or the figures that he uses. His testimony filled in some of this information.

¶117 McLaughlin's report concluded, based on his "extensive experience appraising IRC § 42 properties," that "[t]he inability to obtain reliable data regarding the rent and income restrictions for IRC § 42 properties prevents a valid comparable sales valuation in this case."

¶118 Nevertheless, McLaughlin derived a capitalization rate based on sales of fifteen Section 42 properties. Although McLaughlin claimed he could not perform a comparable sales analysis of Regency West because he did not have the Land Use Restriction Agreements (LURAs) for his list of fifteen Section 42 sales, McLaughlin relied on data from Section 42 sales to derive a capitalization rate for his income approach.[6] The majority opinion unsuccessfully attempts to explain away this inconsistency in McLaughlin's evidence regarding the availability of comparables.

¶119 Based upon an income valuation approach alone, McLaughlin concluded that Regency West's value was nearly two million dollars less than the valuations that Racine or Furdek and Weissenfluh reached.

¶120 McLaughlin and the majority opinion rely solely on the income approach to conclude that Racine's original assessment was excessive. The majority opinion is unsuccessful in explaining away precedent. The cases have stated time and time again that the income approach "may never be the sole basis for an assessment of property." Waste Mgmt. of Wis. v. Kenosha Cty. Bd. of Review, 184 Wis. 2d 541, 558, 516 N.W.2d 695 (1994); see

---

[6] There is no evidence that McLaughlin attempted to obtain the LURAs for any of these fifteen properties or communicated with WHEDA, buyers, sellers, or brokers to obtain information.

also <u>Bischoff v. City of Appleton</u>, 81 Wis. 2d 612, 260 N.W.2d 773 (1978).[7]

¶121 After comparing evidence presented by the experts, the circuit court unsurprisingly ruled in favor of Racine. The circuit court was persuaded by Racine's appraisers and experts, but was not impressed by McLaughlin. The circuit court stated its finding that Racine's assessors were more credible as follows:

> Credibility of the assessors and experts is critical to this analysis. Based upon the years of experience, knowledge, and demeanor, this Court finds the testimony of the City's assessors and experts more credible than that of the plaintiff's expert, Scott McLaughlin. The City's assessors and experts are very familiar and experienced in valuing property in the Racine and Southeastern Wisconsin area and McLaughlin is not.

Based on my review of the record, without even giving deference to the circuit court, I agree with the circuit court.

¶122 I conclude that Regency West has failed to present sufficient evidence showing that the initial assessments were excessive. Racine's assessors and experts presented the more persuasive evidence that Racine's initial assessments were not excessive.

IV

---

[7] See <u>State ex rel. I.B.M. Corp. v. Bd. of Review</u>, 231 Wis. 303, 312, 260 N.W. 784 (1939) ("Though net income from the rental of either real or personal property is always a proper element to consider, it cannot be considered as the sole controlling factor in determining value of either real or personal property. Such a rule, if given approval, would require a holding that non-income producing property is practically valueless for taxation purposes.").

¶123 Before I end my analysis, I discuss court procedure. I dissented in an unpublished order granting review in the instant case. I repeat my objection in this published dissent to inform litigants and lawyers about court procedure.

¶124 On November 16, 2015, the court adopted a procedure governing when a justice may hold for further discussion a petition for review in which a Supreme Court Commissioner recommended granting review.

¶125 The procedure applies when the justices vote on the Wisconsin Supreme Court Commissioners' recommendations on petitions for review by e-mail. Most months the court votes on the recommendations in person, in closed conference. The new e-mail procedure states:

> Regarding petitions for review, certifications, petitions to bypass, original actions, petitions for supervisory writ, and petitions for writ of mandamus, prohibition, quo warranto, and habeas corpus, some months are scheduled as mail-in conferences, whereby each justice votes, by e-mail, on the recommendations of each Commissioner. A justice, who wishes to hold a matter for which a Commissioner has recommended granting review, must submit in writing, with his or her e-mail votes, the specific reason(s) why he or she would not approve the grant as recommended by the Commissioner. Within 5 calendar days of that writing, all justices shall vote, by e-mail, to grant the matter, deny the matter, or otherwise approve the suggestions in the written proposal. If sufficient votes to grant the matter remain, the grant order shall issue within two business days. If the matter no longer has the requisite votes to grant, it shall be discussed in a court conference, but in any event, no later than at the next in-person petition for review conference.

17

¶126 The new procedure was adopted without any notice to the Supreme Court Commissioners and Clerk of the Supreme Court, let alone the litigants, lawyers, and the public.[8]

¶127 Although I did not vote in favor of adopting this procedure, I have followed it. At the very least, the court should follow its adopted procedures. As I have written before, a scent of lawlessness pervades the court.

¶128 The effect of several newly adopted procedures (whether the effect is intended or not) is to silence an individual justice's voice——whether that justice wants to hold a petition for review for further discussion, write separately on a matter, or dissent.

¶129 I have pledged to continue to discharge my duties on this court as the people of the state have four times elected me to do. The commitment I made to myself nearly 40 years ago and in four successive elections since then remains: Be independent, impartial, and non-partisan, and help the court system improve. I will continue to implement that commitment whether in the majority or in dissent.

¶130 We are a court of seven. Each justice is only one voice of seven. I will continue to be one justice with one

---

[8] The procedure was adopted pursuant to the Introduction to the Supreme Court's Internal Operating Procedures, which states that the Internal Operating Procedures "may be changed without notice as circumstances require." The Supreme Court Internal Operating Procedures are available in Volume VI of the Wisconsin Statutes (2013-14).

voice, but mine will not be a timid voice as I continue to serve the people of the state of Wisconsin.

¶131 For the reasons set forth, I write on the merits of the case and court procedure.

¶132 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.